**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| ELECTRONIC PRIVACY | ) | |
| INFORMATION CENTER | ) | |
|  | ) | |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | Case No. 1:10-cv-00196-BAH |
|  | ) | |
| NATIONAL SECURITY AGENCY | ) | |
|  | ) | |
|  | ) | |
| Defendant. | ) | |

_____ )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

The Electronic Privacy Information Center ("EPIC") brought this Freedom of Information Act ("FOIA") action to compel the disclosure of National Security Presidential Directive 54 ("NSPD 54") from the National Security Agency ("NSA"), along with certain allegedly associated documents. NSA has produced all responsive documents (with some limited redactions), with the exception of NSPD 54 which NSA has withheld in its entirety.

As outlined herein and in the declarations attached to this motion, NSA's withholding of NSPD 54 complies with specific statutory exemptions to FOIA's disclosure requirement – most relevantly, FOIA Exemption 5, which, among other protections, allows a government agency to withhold a document – like NSPD 54 – that constitutes a confidential presidential communication. NSPD 54 falls within the core of

the presidential communication privilege, which is one of the privileges incorporated into

Exemption 5:  The document is a direct, confidential communication from the President

to senior officials of his administration, on a sensitive topic where disclosure would

inhibit the President's ability to engage in effective communication and decisionmaking.

Additionally, certain specific sections of NSPD 54 and the other documents

responsive to Plaintiff's FOIA request (documents which were produced with limited

redactions) were properly withheld under two other FOIA Exemptions:  Exemption 1,

which allows the withholding of documents (or portions thereof) that have been properly

classified in the interest of national security, and Exemption 3, which allows the

withholding of documents (or portions thereof) protected from release by statute.

Because NSA has fully discharged its obligations under FOIA, Defendant

respectfully requests that summary judgment be entered in its favor.

## I.    Background

### A.    EPIC's FOIA Request

On June 15, 2009, EPIC filed a FOIA request with the NSA (the "FOIA

Request"), requesting the following documents:

> (1)  the text of the National Security Presidential Directive 54 . . . ; (2) the full text,
> including previously unreported sections, of the Comprehensive National
> Cybersecurity Initiative, as well as any executing protocols distributed to the
> agencies in charge of its implementation; and (3) any privacy policies related to
> either the Directive[ or] the Initiative, including but not limited to, contracts or
> other documents describing privacy policies for information shared with private
> contractors to facilitate the Comprehensive National Cybersecurity Initiative.

### B.     NSPD 54

As its name indicates, NSPD 54 – the primary document sought by Plaintiff –

constitutes direction from the President himself on sensitive and national security topics.

The President issued NSPD 54 to communicate his direction on specific actions to be

undertaken by the federal government to safeguard federal cybersecurity.  He provided

this direction to a number of high ranking presidential advisers, Cabinet officials, and

agency heads, including (*inter alia*) the Directors of NSA and the Office of Management

and Budget, and the Secretaries of State, Defense, Homeland Security, Commerce, and

Treasury.  Declaration of Mary Ronan ("Ronan Decl.") ¶ 13.  NSPD 54 directs these (and

other) officers to take a variety of specific actions towards (*inter alia*) increasing the

security of federal government networks, protecting data, and improving the federal

government's capacity to deter and respond to outside threats to federal systems and

information.  *Id.*  NSPD 54 thus collected a variety of specific cybersecurity directives

issued by the Presidents to high-ranking officials within the Executive Branch.  *See id.*

### C.     Processing of Plaintiff's FOIA Request

After various correspondence to and from EPIC (*see* Declaration of Diane M.

Janosek ("Janosek Decl.") ¶¶ 10-17), the NSA (i) produced two documents responsive to

the third provision of the FOIA request (with limited redactions), (ii) withheld two draft

documents responsive to the third provision of the FOIA request because those

documents were non-final and deliberative, and (iii) withheld the NSPD 54 in full.  NSA

also informed EPIC that it had conducted a reasonable search to locate agency records

responsive to the FOIA Request's second item, but that no responsive additional documents were located.  *Id.* ¶ 15.

EPIC filed an administrative appeal challenging certain aspects of NSA's response to the FOIA request (*id.* ¶ 17), and thereafter filed suit on February 4, 2010 challenging (i) the NSA's decision to withhold the two aforementioned draft documents responsive to prong three of the FOIA Request, and (ii) the NSA's decision to withhold NSPD 54.[1] EPIC has not challenged the adequacy or scope of the search for documents responsive to item three of the FOIA Request, nor has EPIC challenged the NSA's withholding of information from the two documents originally produced in response to prong three of the FOIA Request.  Additionally, although EPIC's administrative appeal to the NSA challenged "the NSA's failure to disclose any records responsive to part 2 of EPIC's FOIA request" (*see* Complaint ¶ 46), EPIC's Complaint has not challenged this aspect of the NSA's response to item two of the FOIA Request.  *See* Complaint ¶¶ 60-63.[2]

---

[1] EPIC's Complaint also brought suit against the National Security Council and alleged that NSA's response to the FOIA Request constituted a violation of the Administrative Procedure Act.  The United States moved to dismiss these claims.  By order of July 7, 2011 ("July 7 Order"), this Court granted the United States' motion and dismissed counts III and IV of the Complaint, thereby leaving only the two claims against the NSA discussed in the instant motion.

[2] This Court's description of Plaintiff's Complaint confirms that Plaintiff has not affirmatively challenged NSA's response to Item 2 of the FOIA Request.  *See* July 7 Order at 4-5 ("In Count I of the Complaint, the plaintiff alleges that the NSA violated FOIA by failing to comply with statutory deadlines regarding its administrative appeal. [Complaint] ¶¶ 52-57.  In Count II, the plaintiff alleges that the NSA failed to disclose responsive agency records through (1) withholding records that are not exempt, (2) withholding nonexempt portions of records that are reasonably segregable from exempt portions, and (3) improperly referring a portion of the plaintiff's FOIA request to the NSC.  *Id.* ¶¶ 58-63.")

During the pendency of this litigation, NSA finalized the two draft documents (discussed above) that were withheld from production in response to item three of the FOIA Request. Accordingly, the NSA produced those documents to EPIC (with limited redactions) on August 30, 2011. Janosek Decl. ¶ 15 & n.2. The NSA has thus produced all documents that were responsive to item three of the FOIA Request, and Plaintiff has not challenged the scope of NSA's search for documents responsive to item three, or alleged that NSA has failed to disclose any additional documents.

Plaintiff's remaining claims thus largely focus on the decision to withhold NSPD 54. As discussed herein, because NSA complied with its obligations under FOIA with respect to all three sub-sections of the FOIA Request, this Court should grant summary judgment in favor of NSA.

## II.   Statutory Background and Standard of Review

The Freedom of Information Act, 5 U.S.C. § 552, generally mandates disclosure, upon request, of government records held by an agency of the federal government except to the extent such records are protected from disclosure by one of nine exemptions. The "fundamental principle" that animates FOIA is "public access to Government documents." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). At the same time, Congress recognized "that legitimate governmental and private interests could be harmed by release of certain types of information and provided nine

specific exemptions under which disclosure could be refused." *FBI v. Abramson*, 456

U.S. 615, 621 (1982); *see also* 5 U.S.C. § 552(b).  While these exemptions are to be

"narrowly construed," *Abramson*, 456 U.S. at 630, courts must not fail to give them

"meaningful reach and application." *John Doe Agency*, 493 U.S. at 152.  FOIA thus

"represents a balance struck by Congress between the public's right to know and the

government's legitimate interest in keeping certain information confidential." *Ctr. for*

*Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 925 (D.C. Cir. 2003).

"FOIA cases are typically and appropriately decided on motions for summary

judgment." *Moore v. Bush*, 601 F.Supp.2d 6,12 (D.D.C. 2009).  Summary judgment is

appropriate "if the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(1)(C)(2).  When a

plaintiff challenges an agency's decision to withhold a document under a FOIA

exemption, the agency bears the burden of justifying nondisclosure. *Judicial Watch, Inc.*

*v. Dep't of Army*, 402 F.Supp.2d 241, 245 (D.D.C. 2005).  An agency can meet its burden

by submitting declarations or affidavits that describe the documents and justify the basis

for nondisclosure with reasonably specific detail. *Military Audit Project v. Casey*, 656

F.2d 724, 738 (D.C. Cir. 1981).

In determining whether an agency has met its burden, Courts review *de novo* the

agency's use of a FOIA exemption to withhold documents. *Wolf v. CIA*, 473 F.3d 370,

374 (D.C. Cir. 2007).  "[S]ummary judgment is warranted on the basis of agency

affidavits when the affidavits describe the justifications for nondisclosure with reasonably

specific detail . . . and are not controverted by either contrary evidence in the record nor

by evidence of agency bad faith." *Wolf*, 473 F.3d at 374 (internal quotation marks

omitted) (omission in original).  "Ultimately, an agency's justification for invoking a

FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id*. at 374-75.

## ARGUMENT

### I.     NSPD 54 is a Confidential Presidential Communication and is Therefore Entirely Exempt From Disclosure Under FOIA Exemption 5

NSPD 54 constitutes a confidential presidential communication and is therefore

exempt from disclosure under FOIA Exemption 5.

Exemption 5 exempts from mandatory disclosure "inter-agency or intra-agency

memorandums or letters which would not be available by law to a party . . . in litigation

with the agency." 5 U.S.C. § 552(b)(5).  In particular, it "exempts those documents . . .

that are normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck &

Co*., 421 U.S. 132, 149 (1975).   Exemption 5 thus incorporates the privileges available in

civil discovery and allows NSA to withhold privileged documents from production.  *See

id.*

Among other privileges, the D.C. Circuit has repeatedly held that Exemption 5

incorporates the presidential communications privilege, which is rooted in separation of

powers concerns and has been recognized since the earliest days of the United States.

*See, e.g.*, *United States v. Nixon*, 418 U.S. 683, 708 (1974) (describing presidential

communications privilege as "fundamental to the operation of Government and

inextricably rooted in the separation of powers under the Constitution"); *see also In re*

*Sealed Case*, 121 F.3d 729, 745 (D.C. Cir. 1997); *Judicial Watch v. Department of Justice*, 365 F.3d 1108, 1113 (D.C. Cir. 2004).  The privilege applies to "communications in performance of a President's responsibilities, . . . and made in the process of shaping policies and making decisions."  *Nixon v. Administrator of General Services*, 433 U.S. 425, 449 (1997) (internal citations and formatting omitted).[3]

This case involves application of the established principle that "communications directly involv[ing] the President . . . are entitled to the privilege" because of the need to protect the President's ability "to make decisions confidentially."  *Loving*, 550 F.3d at 40 (internal citations omitted); *Citizens for Responsibility & Ethics v. United States Dep't of Homeland Sec.*, 514 F. Supp. 2d 36, 49-50 (D.D.C. 2007) ("The core of the presidential communications privilege is the protection of the President's need for confidentiality in the communications of his office." (internal citations omitted)).

The privilege "covers final and post-decisional materials" as well as deliberative ones.  *In re Sealed Case*, 121 F.3d at 745.  Such final documents "often will be revelatory of the President's deliberations" especially where such documents both embody presidential direction as to "a particular course of action," while also "ask[ing] advisers to submit follow-up reports so that [the President] can monitor whether this course of action is likely to be successful."  *In re Sealed Case*, 121 F.3d at 745-746.  The D.C. Circuit has sensibly applied the presidential communications privilege to final and post-decisional

---

[3] Documents subject to the presidential communications privilege are shielded in their entirety.  *See, e.g.*, *Loving v. DOD*, 550 F.3d 32, 37-38 (D.C. Cir. 2008) ("The privilege covers documents reflecting presidential decisionmaking and deliberations . . . and it covers the documents in their entirety." (internal citations omitted)); *Judicial Watch*, 365 F.3d at 1114; *In re Sealed Case*, 121 F.3d at 745.

documents because "limit[ing] the President's ability to communicate his decisions privately" would "interfere[e] with his ability to exercise control over the executive branch." *In re Sealed Case*, 121 F.3d at 745-746.

Because NSPD 54 is a confidential post-decisional communication from the President to senior officials of his administration, the presidential communications privilege squarely applies in this case, thereby relieving NSA of any obligation to disclose NSPD 54. Detailed descriptions of NSPD 54 are set out in the attached Janosek Declaration and Ronan Declaration, which explain why the presidential communications privilege applies to NSPD 54 and justifies withholding it in its entirety.

First, NSPD 54 embodies communications directly from the president. Janosek Decl. ¶¶ 8, 31; Ronan Decl. ¶¶ 7, 13. As the Ronan Declaration makes clear, NSPD 54 was issued by the President and solicits feedback in order to assist the President's ability to oversee implementation of his directives. Ronan Decl. ¶ 13. As discussed above, the presidential communications squarely applies to communications, such as these, that directly involve the President and that solicit responses designed to aid the President's ability to monitor implementation efforts. *See, e.g.*, *In re Sealed Case*, 121 F.3d at 745-746; *see also Loving*, 550 F.3d at 40.

Second, NSPD 54 was communicated to top presidential advisors and cabinet officials. As described in the Ronan declaration, NSPD 54 embodied directives to the director of the Office of Management and Budget, the President's National Security Staff, various cabinet officials, and other top presidential assistants. Ronan Decl. ¶ 13. At its core, the presidential communications privilege is meant to protect exactly this type of

communication:  High level communications between the President and his highest ranking advisors and officials of his administration, which present the greatest need for confidential, unencumbered dialog.  *See, e.g.*, *Judicial Watch*, 365 F.3d at 1116-17.

Third, the NSPD 54 is a confidential communication.  The President has explicitly sought to maintain the confidentiality of the decisions embodied in NSPD 54 and, relatedly, has solicited confidential feedback in return.  As the Ronan Declaration makes clear, the memorandum accompanying NSPD 54 stressed the confidentiality of NSPD 54, and prohibited dissemination of the document beyond its authorized recipients without White House the approval of the White House and further instructed that even within receiving agencies, copies should be distributed only on a need to know basis.   Ronan Declaration ¶ 7; *see also* Janosek Declaration ¶¶ 32-33 (discussing confidentiality of NSPD 54 and limitations on its distribution).  As the D.C. Circuit has repeatedly held, the presidential communications privilege applies where (as here) the President concludes that a document embodying his directives needs to remain confidential.  *Judicial Watch*, 365 F.3d at 1113-1114 ; *In re Sealed Case*, 121 F.3d at 744.  And NSPD 54's request for confidential reporting back to the President (Ronan Declaration ¶ 13) likewise underscores the necessity of privilege in this case because disclosure of the President's requests to have "his advisers . . . submit follow-up reports" would "limit the President's ability to communicate his decisions privately, thereby interfering with his ability to exercise control over the executive branch."  *In re Sealed Case*, 121 F.3d at 745-746.  Thus, the President's various efforts to keep NSPD 54 confidential support the application of the privilege in this case.

As noted above, where the presidential communications privilege applies, the entire document is exempt from disclosure.  *See, e.g.*, *Loving v. DOD*, 550 F.3d at 37-38; *Judicial Watch*, 365 F.3d at 1114; *In re Sealed Case*, 121 F.3d at 744.  Thus, because NSPD 54 embodies various confidential directives from the President to high ranking executive officials, and because the document likewise solicits confidential feedback from these same officials directly to the President, the entire document was properly withheld under the presidential communications privilege.

Although Exemption 5 does not require a showing of harm to sustain a claim of presidential communication privilege, *see, e.g.*, *McKinley v. Bd. of Governors of the Fed. Reserve Sys.*, 647 F.3d 331 (D.C. Cir. 2011); *Quarles v. Department of Navy*, 893 F.2d 390, 393 (D.C. Cir. 1990), the release of NSPD 54 would, in fact, result in specific harm to the President and his top advisers.  Disclosure of NSPD 54 would implicate the core concerns underlying the presidential communication privilege because it would inhibit the fully informed and candid deliberation within the White House and the Executive Branch that is necessary to enable the President to fulfill his duties as Commander in Chief and as Chief Executive.  Ronan Decl. ¶ 14.  Release of NSPD 54 would impair the President's ability to effectively communicate directives to top advisers and to solicit feedback in response – both on issues of cybersecurity and on all other issues requiring confidential Executive Branch communication.  *Id.*

Beyond the harms to presidential communication generally, release of NSPD 54 would undermine the very cybersecurity efforts that the document sought to promote: communications between the President and high ranking Executive Branch advisers and

cabinet officials on the security of federal network assets.  As described herein, NSPD 54 employs a confidential process to direct high ranking federal officials to assess and take certain specific actions with respect to cybersecurity, and also tasks these same federal officials with submitting confidential reports on cybersecurity efforts directly back to the President.  Disclosure of such efforts would undermine federal cybersecurity by alerting the United States' adversaries to aspects of the very capabilities of federal cybserspace that the President sought to protect through NSPD 54.  More generally, disclosure of NSPD 54 would undermine the ability of federal officials to communicate effectively on efforts to promote cybsersecurity – a confidential process that the President deemed critical to achieving the purposes of NSPD 54.

Accordingly, because NSPD 54 constitutes presidential communication of a type that is exempt from mandatory disclosure under FOIA, the Court should enter summary judgment for defendant.

## II.  Sections of NSPD 54 Are Properly Classified and Therefore Exempt From Disclosure Under FOIA Exemption 1

In addition to the presidential communication privilege – which, as discussed above, allows the withholding of NSPD 54 in its entirety – certain sub-sections of NSPD 54 are protected from disclosure under FOIA Exemption 1.

Exemption 1 protects records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).  Several provisions of NSPD 54 are properly classified under

Executive Order 13526 and meet both of the requirements for nondisclosure under Exemption 1.

Given the significance of classified information, courts are particularly deferential to classification decisions by the executive branch.  As uniformly recognized by courts, classification decisions are entitled to "substantial weight."  *See, e.g.*, *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009).  Moreover, it is not appropriate for courts to substitute their judgment for that of the executive with regard to classified information. *See Larson*, 565 F.3d at 865; *Halperin v. CIA*, 629 F.2d 144, 148 (D.C. Cir. 1980) ("Judges . . . lack the expertise necessary to second-guess such agency opinions in the typical national security FOIA case.").  As a result, the D.C. Circuit has held that "the text of Exemption 1 itself suggests that little proof or explanation is required beyond a plausible assertion that information is properly classified."  *Morley v. Cent. Intelligence Agency*, 508 F.3d 1108, 1124 (D.C. Cir. 2007).

Under Executive Order 13526, information may be classified if it meets the following conditions:

> (1) an original classification authority is classifying the information;
> (2) the information is owned by, produced by or for, or is under the control of the United States Government;
> (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and
> (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security,

> which includes defense against transnational terrorism, and
> the original classification authority is able to identify or
> describe the damage.

Executive Order 13526, Section 1.1. The classified provisions of NSPD 54 meet each of

these conditions and therefore have been properly classified and are exempt from

disclosure.

First, Ms. Ronan, Director of the Access Management Office for the National

Security Staff (NSS), has authority to classify and declassify national security

information, has personally reviewed the classified  material, and has determined that it

has been properly classified under Executive Order 13526.  Ronan Decl. ¶ 1-12.

Second, Ms. Ronan has concluded that the release of the information classified as

"SECRET" could reasonably be expected to cause serious damage to the national security

and that the release of the information classified as "TOP SECRET" could reasonably be

expected to cause exceptionally grave damage to the national security.  *Id.* ¶ 11.

Third, the classified material falls within the categories of classifiable information

listed in section 1.4 of Executive Order 13526.  Executive Order 13526 provides that

information shall not be considered for classification unless it falls within one (or more)

of eight specifically enumerated categories of information.  The Ronan declaration makes

clear the relevant sections of NSPD 54 have been been properly classified under Sections

1.4(c), because they involve intelligence activities or intelligence sources and methods;

1.4(d), because they involve foreign relations or foreign activities of the United States;

1.4(e), because they involve scientific, technological, or economic matters relating to the

national security; and 1.4(g), because the involve vulnerabilities or capabilities of

systems, installations, infrastructures, projects, plans, or protection services relating to the

national security.  Ronan Decl. ¶ 11.

Thus, the classified material within NSPD 54 is properly exempt from disclosure

under FOIA Exemption 1.

## III.    The NSA Properly Redacted Two Documents Responsive to the Third Item in the FOIA Request Pursuant to FOIA Exemptions 1 and 3

Under FOIA Exemptions 1 and 3, NSA properly withheld the redacted portions of

NSA Policy 1-58 and IAD Management Directive 20 – the two documents produced

during NSA's Supplemental Production as responsive to the third item in the FOIA

Request (the "Item Three Documents").

### A.    Material Redacted from NSA Policy 1-58 is Properly Classified and Therefore Exempt from Disclosure under FOIA

The NSA properly withheld from production material within NSA Policy 1-58 that

is classified and therefore exempt from disclosure under FOIA Exemption 1.

As discussed above, Exemption 1 protects records that are properly classified.

Redacted material within NSA Policy 1-58 is properly classified as "secret" under

Executive Order 13526 and meets the requirements for nondisclosure under Exemption 1.

The conditions for classification are provided by Executive Order 13526 and, as

described above, require classification by an original classification authority, require the

classified information to fall within one of the categories of information provided by

Section 1.4 of Executive Order 13525, and require a determination that the unauthorized

disclosure of the information reasonably could be expected to result in damage to the

national security.  Executive Order 13526, Section 1.1.  The classified material within

NSA Policy 1-58 meets each of these conditions and has been properly classified.

First, Ms. Janosek, Deputy Associate Director for Policy and Records for the

National Security Agency, has authority to classify and declassify national security

information, has personally reviewed the redacted material, and has determined that it has

been properly classified under Executive Order 13526.  Janosek Decl. ¶ 1, 19-23.  Ms.

Janosek has further concluded that the release of this information could reasonably be

expected to cause serious damage to the national security.  *Id.* ¶ 20.

Second, the redacted material falls within the categories of classifiable information

listed in section 1.4 of Executive Order 13526.  As discussed above, Executive Order

13526 provides that information shall not be considered for classification unless it falls

within one (or more) of eight specifically enumerated categories of information.  Among

its other provisions, Section 1.4 allows for the classification of documents embodying

information regarding foreign governments (Section 1.4(b)), intelligence activities

(including covert action), intelligence sources and methods, or cryptology (Section

1.4(c)), and vulnerabilities or capabilities of systems, installations, infrastructures,

projects, plans, or protection services relating to the national security (Section 1.4(g)).

The Janosek Declaration makes clear that the material redacted from NSA Policy

1-58 – embodying operational details of NSA's implementation of NSPD 54 – was

properly classified because it included information on these three various topics.  The

information in NSA/CSS Policy 1-58 that was withheld under Exemption 1 would, if

released, reveal (among other things) operational details of NSA's implementation of the

16

NSPD 54.  Janosek Decl. ¶ 19, 22-23.  Ms. Janosek states that the release of this

information would in turn reveal information about NSA's capabilities and limitations,

thereby rendering the material appropriately classified under Sections 1.4(c) and 1.4(g).

*Id.*

The Janosek Declaration also demonstrates that release of the redacted information

would disclose the methodology used by NSA to respond to cyber-threats, disseminate

warning information, assist DHS in the performance of its cyber-mission, ensure the

security of US government national cyber systems, and protect the security of federal

systems from adversaries.  Because revelation of this type of information could help

identify vulnerabilities in U.S. assets (Janosek Decl. ¶ 21-23), the information was

properly classified and redacted under Section 1.4 and FOIA Exemption 1.

**B.      The NSA Also Properly Redacted Material from the Item Three
           Documents Under Exemption 3**

NSA has also properly invoked Exemption 3, which covers records that are

"specifically exempted from disclosure" by another federal statute "if that statute—

establishes particular criteria for withholding the information or refers to the particular

types of material to be withheld."  5 U.S.C. § 552(b)(3).

In promulgating FOIA, Congress included Exemption 3 to recognize the existence

of collateral statutes that limit the disclosure of information held by the government, and

to incorporate such statutes within FOIA's exemptions.  *See Baldrige v. Shapiro*, 455

U.S. 345, 352-53 (1982); *Essential Info., Inc. v. U.S. Info. Agency*, 134 F.3d 1165, 1166

(D.C. Cir. 1998).  Under Exemption 3, "the sole issue for decision is the existence of a

relevant statute and the inclusion of withheld material within the statute's coverage." *Fitzgibbon v. CIA*, 911 F.2d 755, 761-62 (D.C. Cir. 1990).  Thus, if another statute is recognized as providing a basis for invoking Exemption 3, an agency is *per se* authorized to withhold material falling within the scope of that statute.

The Janosek Declaration supports the "two-part inquiry [that] determines whether Exemption 3 applies to a given case." *Minier v. CIA*, 88 F.3d 796, 800-01 (9th Cir. 1996) (citing *CIA v. Sims*, 471 U.S. 159, 67 (1985)).  "First, a court must determine whether there is a statute within the scope of Exemption 3.  Then, it must determine whether the requested information falls within the scope of the statute."  *Id.*

Several statutes provide explicit bases for the withholdings from the Item Three Documents.  Section 6 of the National Security Agency Act of 1959, Public Law 86-36 (50 U.S.C. § 402 note) ("Section 6"), exempts the NSA from disclosing its operational details.  Section 6 provides that "[n]othing in . . . any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, [or] of any information with respect to the activities thereof. " (Emphasis added).  The D.C. Circuit has repeatedly held Section 6 "to be an Exemption 3 statute." *See, e.g.*, *Hayden v. National Sec. Agency/Central Sec. Service*, 608 F.2d 1381, 1389 (D.C. Cir. 1979).  Thus, Exemption 3 properly allows for the withholding of any material relating to NSA Operations.

In specifically exempting NSA operational information from the requirements of other disclosure laws (including FOIA), Congress recognized, as a matter of law, the potential and serious harm that might arise from the disclosure of any information

relating to NSA activities.  *Hayden v. NSA,* 608 F.2d 1381, 1390 (D.C. Cir. 1979);

*Larson v. Department of State*, 565 F.3d 857, 868 (D.C. Cir. 2009); *Students Against*

*Genocide v. Department of State*, 257 F.3d 828 (D.C. Cir. 2001); *People for the*

*American Way v. NSA*, 462 F.Supp.2d 21, 30 (D.D.C. 2006).  But, in any event, "[a]

specific showing of potential harm to national security . . . is irrelevant to the language of

[Section 6 because] Congress has already, in enacting the statute, decided that disclosure

of NSA activities is potentially harmful."  *Hayden*, 408 F.2d at 1390.

The protection provided by this statutory privilege is, by its very terms, absolute,

and "must be construed to prohibit the disclosure of information relating to NSA's

functions and activities as well as its personnel."  *See, e.g.*, *Linder v. NSA*, 94 F.3d 693

(D.C. Cir. 1996).  Section 6 states unequivocally that, notwithstanding any other law,

including FOIA, NSA cannot be compelled to disclose *any* information with respect to its

activities.  *See Hayden,* 608 F.2d at 1389.  To invoke this privilege, NSA must

demonstrate only that the information it seeks to protect falls within the scope of Section

6.  "[A]ll that is necessary for the [NSA] to meet its burden under Public Law No. 86-36

and Exemption 3" is support in a declaration that the "requested documents concern[] a

specific NSA activity, to wit, intelligence reporting based on electromagnetic signals."

*Id.* at 1390.

Two other statutes provide overlapping bases for withholding information under

FOIA.  First, 18 U.S.C. § 798 prohibits the unauthorized disclosure of classified

information (i) concerning the communications intelligence activities of the United States

or (ii) obtained by the process of communication intelligence derived from the

communications of any foreign government.  In exempting "communications intelligence" from disclosure, this statute allows the withholding of any information regarding procedures and methods used in the interception of communications and the obtaining of information from such communications.

Similar protection is provided by Section 102A(i)(l) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-1(i)(1), which protects "intelligence sources and methods from unauthorized disclosure, including NSA sources and methods.  Janosek Decl. ¶ 27.  Like the protection afforded to core NSA activities by Section 6 of the NSA Act of 1959, the protection afforded to intelligence sources and methods is absolute.  *See Central Intelligence Agency v. Sims*, 471 U.S. 159 (1985).  Whether the sources and methods at issue are classified is irrelevant for purposes of the protection afforded by 50 U.S.C. § 403-l(i)(1).  *Id*.

The information redacted from the Item Three Documents is definitively exempted from disclosure on the basis of the statutes described above.  The redacted material addresses how NSA implements NSPD 54's cybersecurity related directives (Janosek Decl. ¶ 28) – information that self-evidently relates to the operation of the NSA (and is therefore exempt from disclosure under Section 6) and that also is exempted from disclosure from the other statutes discussed above.

The NSA's implementation of NSPD 54 directly relates to core agency functions – assisting in the protection of U.S. information systems.  *Id.*  Revealing the material redacted from the Item Three Documents would explicitly reveal certain techniques used

by NSA to protect these information systems; a methodology exempt from disclosure under Section 6.

Likewise, the information also directly relates to NSA efforts to collect, process, analyze, and disseminate signals intelligence information for national foreign intelligence and counterintelligence purposes. *Id.* ¶¶ 3, 28. Section 6 provides absolute protection to such NSA operational information. Accordingly, all of the information withheld in NSA/CSS Policy 1-58 and IAD Management Directive 20 is exempt pursuant to Exemption 3 based on Section 6 alone.

Additionally, some of the same information that is exempt based on Section 6 is also exempt under Exemption 3 (i) based on 18 U.S.C. § 798, because disclosure would reveal classified information derived from NSA's exploitation of foreign communications; and (ii) under 50 U.S.C. § 403-1(i)(1), because the information concerns intelligence sources and methods – specifically, as discussed above, the sources and methods used by the NSA to collect and evaluate signals intelligence. *Id.* ¶ 29.[4]

## IV.    The NSA Conducted a Reasonable Search for Documents Responsive to Item Two of the FOIA Request

NSA's search for records responsive to item number two of the FOIA request – seeking "the full text, including previously unreported sections, of the Comprehensive

---

[4] Similarly, separate and apart from the invocation of the presidential communications privilege over NSPD 54 and the classification exemption asserted in the Ronan Declaration, the NSA has invoked Exemptions 1 and 3 with respect to one paragraph of NSPD 54 that relates to the operations of the NSA and contains classified material. This material is exempt from disclosure for the same reasons discussed herein: It has been properly classified and, in speaking to the operations of the NSA, it is excepted from disclosure by Section 6 and the other statutes discussed above. *See* Janosek Decl. ¶ 34.

National Cybersecurity Initiative, as well as any executing protocols distributed to the agencies in charge of its implementation" – was reasonably calculated to uncover all documents responsive to that request and therefore provides a sufficient basis for granting summary judgment as to item two of the FOIA Request.

As an initial matter, it bears noting that Plaintiff has not challenged NSA's response to this item of the FOIA Request. As discussed above, NSA informed EPIC that its reasonable search had not uncovered agency records responsive to the second prong of EPIC's request. Janosek Decl. ¶ 15. Although EPIC's administrative appeal challenged this determination (Complaint ¶ 46), EPIC's complaint in this litigation has not challenged the NSA's response to item two of the FOIA Request. *See* Complaint ¶¶ 60-63; *see also* July 7 Order at 4-5.

In any event, even if Plaintiff's Complaint could be deemed to challenge the NSA's response to Item Two, such a challenge should be dismissed.

Where a plaintiff challenges the adequacy of an agency's search, an agency must demonstrate "that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) (citations omitted). According to the D.C. Circuit, "the issue . . . is not whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate." *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (emphasis and citations omitted). In evaluating the adequacy of a search, courts will accord agency affidavits "a presumption of good faith,

which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991); *see also Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981). The statute does not require "meticulous documentation [of] the details of an epic search." *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982).

Item Two essentially seeks two categories of information: (1) "the full text . . . of the Comprehensive National Cybersecurity Initiative" ("CNCI") and (2) "executing protocols distributed to the agencies in charge of" the CNCI's implementation. In response to Item Two, the NSA conducted comprehensive searches in June and July 2009 within the relevant Signal Intelligence Directorate and Information Assurance Directorate organizations – the subdivisions of the NSA plausibly responsible for implementing aspect of the CNCI – searching for any potentially responsive documents. Janosek Decl. ¶ 36.

The full text of the CNCI is embodied in NSPD 54. *Id.* Accordingly, the full text of the CNCI was properly withheld along with the remainder of NSPD 54 for the various reasons discussed above.

Otherwise, Item Two seeks "executing protocols distributed to the agencies in charge of" the CNCI's implementation. Per the plain terms of the FOIA Request, NSA searched for documents that were "distributed to" the NSA – meaning, documents originating outside the NSA – that detailed "executing protocols" for the CNCI. *Id.* ¶ 36. As stated in the Janosek declaration, NSA identified the organizations within NSA which would be responsible for executing aspects of the CNCI (which included the Signal

Intelligence Directorate and the Information Assurance Directorate), and asked those NSA components to search all files for documents distributed to NSA on how to execute the CNCI.  *Id.* ¶¶ 36-37.  Although these same NSA components searched for and produced records responsive to item number three of the FOIA Request, the reasonable search related to Item Two did not result in the location of any responsive documents (other than NSPD 54 itself).  *Id.*

In its administrative appeal, EPIC argued that, in light of their assessment of NSA's involvement in NSPD 54, "it is very unlikely that a truly 'thorough search' by the NSA would fail to turn up a single record satisfying request part 2."  *Id.* ¶ 17, Ex. G at 6.  But the absence of any documents (outside of NSPD 54) is not surprising.  In light of the confidential treatment demanded of NSPD 54 and the presidential dictates embodied in NSPD 54 itself, there is no reason to expect that the NSA would have been supplied with *additional* protocols for executing this confidential document; the directives of the President were presumably sufficient.

In any event, EPIC's speculation as to whether such documents should reasonably exist is irrelevant.  The adequacy of NSA's search must be determined not by its results, "but by the appropriateness of the methods used to carry out the search." *Iturralde v. Comptroller of Currency,* 315 F.3d 311, 315 (D.C. Cir. 2003) (citing *Steinberg v. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994)).  As the D.C. Circuit has held, a plaintiff cannot escape summary judgment simply by speculating as to "records whose existence remains purely hypothetical" because such claims "cannot be conclusively refuted, since to do so the government would have to prove a negative – that the files in question do not

24

exist." *Meeropol v. Meese*, 790 F.2d 942 (D.C. Cir. 1986).  Just so here:  Plaintiff's

unfounded assumption "that a particular subject was of such importance that a

[document] on that subject must have been created" (*id.*) provides an insufficient basis

for challenging the reasonableness of an agency's search.

  As discussed above, the D.C. Circuit has made clear that an agency declaration

provides a sufficient basis for summary judgment absent contrary evidence or evidence of

bad faith by the agency.  *Wolf*, 473 F.3d at 374.  EPIC has submitted no evidence

suggesting that NSA's search was not reasonably calculated to uncover the externally-

generated executing protocols sought by Item Two of the FOIA Request; its conclusory

allegations are therefore insufficient to defeat a motion for summary judgment.

Accordingly, the Janosek Declaration's description of the NSA search demonstrates that

the NSA complied with its obligations under FOIA and provides a sufficient basis for

granting summary judgment here.

## CONCLUSION

  For the reasons discussed herein, this Court should grant summary judgment to the

NSA and dismiss Plaintiff's action in its entirety.

DATED: October 11, 2011

        Respectfully submitted,

        TONY WEST
        Assistant Attorney General

        RONALD C. MACHEN
        United States Attorney

ELIZABETH J. SHAPIRO
Deputy Branch Director

  _/s/Joshua Wilkenfeld_
JOSHUA WILKENFELD
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Tel: (202) 305-7920
Fax: (202) 616-8470
Email: joshua.i.wilkenfeld@usdoj.gov

*Counsel for Defendants*