## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action 10-0196 (BAH) ) |
| NATIONAL SECURITY AGENCY, | ) ) |
| Defendant. | ) ) |

### DECLARATION OF DIANE M. JANOSEK

I, DIANE M. JANOSEK, hereby declare and state:

1. I am the Deputy Associate Director for Policy and Records for the National Security Agency (hereinafter, "NSA" or "Agency"). I have served with NSA for over eleven (11) years, and prior to my current assignment, I held various leadership positions throughout the Agency. As the Deputy Associate Director for Policy and Records, I am responsible for processing all requests made pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (2006), as amended by the OPEN Government Act of 2007, Pub. L. No. 110-175. I am also a TOP SECRET classification authority pursuant to section 1.3 of Executive Order 13526. It is my responsibility to assert/invoke FOIA exemptions in the course of litigation. Through the exercise of my official duties as Deputy Associate Director for Policy and Records, I have become familiar with the current litigation arising of the request for records filed by Plaintiff, the Electronic Privacy Information Center, under the FOIA.

2. The purpose of this declaration is to advise the Court that NSA withheld certain information in the documents that were responsive to the Plaintiff's FOIA request, as set forth below, because the information is properly exempt from release under the FOIA based on Exemptions 1 and 3, 5 U.S.C. §§552(b)(1) and (3), respectively[1]. Exemptions 1 and 3 apply because the redacted information is currently and properly classified in accordance with E.O. 13526 and protected from release by statutes, specifically Section 6 of the National Security Agency Act of 1959, 50 U.S.C. § 402 note (Pub. L. 86-36); 18 U.S.C. §798; and Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. §403-1(i)(1). This declaration also advises the Court of the search for records responsive to item #2 of the Plaintiff's request and that NSA did not locate responsive records. In order to provide the necessary context for the discussion that follows, I will describe NSA's origin and mission.

## ORIGIN AND MISSION OF NSA

3. NSA was established by Presidential Directive in October 1952 as a separately organized agency within the Department of Defense. See Executive Order 12333 (as amended by Executive Order 13470 (2008)), section 1.7(c). NSA's cryptologic mission has two main missions: (1) to collect, process, analyze, and disseminate Signals Intelligence (SIGINT) information for national foreign intelligence and counterintelligence purposes; and (2) to conduct information security activities.

4. In performing its SIGINT mission, NSA exploits foreign electromagnetic signals to obtain intelligence information necessary to the national defense, national

---

[1] Exemption 5 is being invoked to withhold National Security Presidential Directive 54 in its entirety because the information in that document embodies confidential presidential communications of a type that are protected by disclosure under the presidential communications privilege. See Ronan Declaration (attached with the Defendant's Memorandum in Support of its Motion for Summary Judgment).

security, or the conduct of foreign affairs. NSA has developed a sophisticated worldwide SIGINT collection network that acquires, among other things, foreign and international electronic communications. The technological infrastructure that supports the NSA's foreign intelligence information collection network has taken years to develop at a cost of billions of dollars and untold human effort. It relies on sophisticated collection and processing technology.

5. There are two primary reasons for gathering and analyzing intelligence information. The first, and most important, is to gain the information required to direct U.S. resources as necessary to counter threats. The second reason is to obtain the information necessary to direct the foreign policy of the United States. Foreign intelligence information provided by the NSA is routinely distributed to a wide variety of senior Government officials, including the President; the President's National Security Advisor; the Director of National Intelligence; the Secretaries of Defense, State, Treasury and Commerce; U.S. ambassadors serving in posts abroad; the Joint Chiefs of Staff; and the Unified and Sub-Unified Commanders. In addition, SIGINT information is disseminated to numerous agencies and departments, including, among others, the Central Intelligence Agency; the Federal Bureau of Investigation; the Drug Enforcement Administration; the Departments of the Army, Navy, and Air Force; and various intelligence components of the Department of Defense. Information provided by NSA is relevant to a wide range of important issues, including, but not limited to, military order of battle; threat warnings and readiness; arms proliferation; terrorism; and foreign aspects of international narcotics trafficking. This information is often critical to the formulation

3

of U.S. foreign policy and the support of U.S. military operations around the world.

Moreover, intelligence produced by NSA is often unobtainable by other means.

6. NSA's ability to produce foreign intelligence information depends on its

access to foreign and international electronic communications. Further, SIGINT

technology is both expensive and fragile. Public disclosure of either the capability to

collect specific communications or the substance of the information itself can easily alert

targets to the vulnerability of their communications. Disclosure of even a single

communication holds the potential of revealing the intelligence collection techniques that

are applied against targets around the world. Once alerted, SIGINT targets can easily

frustrate SIGINT collection by using different or new encryption techniques,

disseminating disinformation, or by utilizing a different communications link. Such

evasion techniques may inhibit access to the target's communications and, therefore,

deny the United States access to information crucial to the defense of the United States

both at home and abroad.

7. The NSA's Information Assurance mission has as its essence the protection of

national security and Department of Defense systems, and direct support to other U.S.

government agencies that help protect other U.S. government systems and the U.S.

critical infrastructure and key resources. NSA must maintain its formidable advantage to

ensure that the United States and its allies can thwart our adversaries who seek to disrupt

and exploit our networks and systems by improving the security of our critical operations

and information. NSA has an unrivaled awareness of threats to national security systems

and how to mitigate them. NSA is simply the standard bearer of government

vulnerability discovery and security testing, and provides or oversees cryptography for

4

national security systems. NSA is also central to public–private initiatives for technology

certification, trust engineering, cross-domain solutions, security automation standards,

best security practices, information assurance education, and operations security.

## NSA/CSS's ROLE IN NSPD 54 AND THE COMPREHENSIVE NATIONAL CYBERSECURITY INITIATIVE (CNCI)

8. On 8 January 2009, the President signed the Cybersecurity Policy Presidential

Directive (NSPD-54 and HSPD-23). The directive was issued directly by the President,

to various Cabinet officials and members of the President's senior staff. The directive

included specific directions to high ranking government officials to take discrete steps

with regard to cybersecurity. NSPD 54 also implemented the CNCI. Due to the

sensitivity of the Presidential policy contained within it, this Directive cannot be

disseminated beyond its authorized recipients without the approval of the White House.

Even further dissemination within the agencies and departments that received a copy of

NSPD 54 is restricted based on a need to know basis.

9. NSA/CSS has a role in the CNCI, but any operational or amplifying details are

properly and currently classified in accordance with E.O. 13526 and/or protected from

release by statute, specifically, Section 6 of the National Security Agency Act of 1959, 50

U.S.C. § 402 <u>note</u> (Pub. L. 86-36); 18 U.S.C. §798; and/or Section 102A(i)(1) of the

Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. §403-1(i)(1).

## PROCESSING OF PLAINTIFF'S FOIA REQUEST

10. Plaintiff filed a FOIA request on 25 June 2009, which was received by NSA

on 26 June 2009, seeking information on the following: (1) The text of the National

Security Presidential Directive 54 otherwise referred to as The Homeland Security

Presidential Directive 23; (2) The full text, including previously unreported sections, of

the Comprehensive National Cybersecurity Initiative, as well as any executing protocols distributed to agencies in charge of its implementation; and (3) Any privacy policies related to the either the Directive, the Initiative, including but not limited to, contracts or other documents describing privacy policies for information shared with private contractors to facilitate the Comprehensive National Cybersecurity Initiative. Tab A. In this request, the Plaintiff also sought expedited processing and "news media' status. Tab A.

11. By letter dated 1 July 2009, the Chief, FOIA/PA Office, NSA/CSS, responded to Plaintiff's FOIA request. Tab B. In this initial response, NSA informed Plaintiff that its request for a waiver of fees was granted. Tab B. NSA also informed Plaintiff that its request for expedited treatment was denied and that NSA would process the Plaintiff's request in NSA's normal processing queue. Tab B. Because NSA denied Plaintiff's request for expedited processing, the NSA informed Plaintiff of its right to appeal this determination. Tab B.

12. By letter dated 30 July 2009, Plaintiff appealed NSA's decision to deny it expedited processing. Tab C. By letter dated 12 August 2009, NSA's FOIA/PA Appeals Authority granted Plaintiff's request for expedited processing based on his review of Plaintiff's original request, the FOIA/PA Office's initial response, and the information provided by Plaintiff on appeal. Tab D. Accordingly, Plaintiff's FOIA request was placed in the Agency's expedite queue, which is one of NSA's six queues maintained by NSA's FOIA Office. See 32 C.F.R. §299.5(d).

13. By letter dated 14 August 2009, the NSA FOIA Office informed the Plaintiff that its request was placed in the expedite queue and that NSA had finished its search for

records responsive to its request. Tab E. NSA's FOIA Office informed Plaintiff that two

documents (USSID SP0018 and NSA/CSS Policy 1-23) which were responsive to item

#3 of its request had been previously released under the FOIA with redactions and that

NSA was providing these documents to the Plaintiff as they were approved for release

under the FOIA. Tab E. NSA's FOIA Office further informed Plaintiff that if it wanted

NSA to conduct a new review of these two previously documents, then it should notify

NSA's FOIA Office. Tab E. NSA's FOIA office then explained why certain information

in these two documents was withheld in the prior FOIA partial releases. Tab E. Further,

NSA's FOIA Office notified Plaintiff as to its right to appeal the withholding of

information in these two documents. Finally, the FOIA Office informed Plaintiff that the

remaining responsive information had been assigned for review to determine what

information could be released and that NSA would finish this review as expeditiously as

possible. Tab E.

14. Plaintiff did not request that NSA re-review these two documents nor did

Plaintiff appeal the withholdings in the two documents that NSA released by letter dated

14 August 2009.

15. By letter dated 26 October 2009, NSA's FOIA Office informed Plaintiff that

it had completed its processing of Plaintiff's FOIA request. Tab F. In this letter, NSA

informed Plaintiff that it had conducted a thorough search of its files, but it could not

locate any records responsive to item #2 of Plaintiff's request. Tab F. NSA further

informed Plaintiff that it had located 3 documents consisting of 26 pages that were

response to items # 1 and 3 of Plaintiff's request. Tab F. Specifically, regarding item #3,

NSA informed Plaintiff that there were two responsive documents[2], but they would be withheld in their entirety based on the fifth exemption of the FOIA because the information contained in these two documents were covered by the deliberative process privilege. <u>Tab F</u>. Additionally, information in both documents was exempt from release based on the third exemption of the FOIA because the information was protected from release by statute. <u>Tab F.</u> Further, information in one of these two documents was also exempt based on the first exemption of the FOIA because the information was currently and properly classified in accordance with the governing executive order. <u>Tab F</u>. Finally, NSA informed Plaintiff that there was one document that was responsive to item #1 of its request, but this document was not an NSA record; rather, the document originated with the National Security Council. <u>Tab F</u>. NSA informed Plaintiff that it had forwarded this document to the National Security Council for a release determination. <u>Tab F</u>.

16. In this letter, NSA also provided Plaintiff with its right to appeal NSA's determinations that there were no documents responsive to item #2 of its request, and its determination that the two documents responsive to item #3 were exempt in their entirety. <u>Tab F</u>.

17. By letter 24 November 2009, Plaintiff appealed these two NSA determinations. <u>Tab G</u>. Plaintiff did not, however, challenge the sufficiency of NSA's search for records responsive to item #3 of Plaintiff's FOIA request. NSA placed Plaintiff's appeal in its appeal queue for processing. On 4 February 2010, before NSA

---

[2] These two documents were draft versions of NSA policies, and they were not finalized at the time the Agency conducted its search for records responsive to the Plaintiff's 25 June 2009 FOIA request. NSA has recently released the finalized versions of these two policies, NSA/CSS Policy 1-58 and IAD Management Directive 20, to the Plaintiff with redactions (pursuant to exemptions 1 and 3 of the FOIA) of classified information (for NSA/CSS Policy 1-58 only) and information protected from release by statute.

had processed Plaintiff's appeal, Plaintiff filed a civil action regarding its FOIA request

to NSA. At that time, NSA ceased processing Plaintiff's appeal.

## FOIA EXEMPTION ONE

18. Section 552(b)(1) of the FOIA provides that the FOIA does not require the

release of matters that are specifically authorized - under criteria established by an

Executive Order - to be kept secret in the interest of the national defense or foreign policy

and are in fact properly classified pursuant to such Executive Order. The current

Executive Order that establishes such criteria is E.O. 13526.

19. Section 1.4 of E.O. 13526 provides that information shall not be considered

for classification unless it falls within one (or more) of eight specifically enumerated

categories of information. The categories of classified information in the documents at

issue here are those found in Section 1.4(b), which includes foreign government

information; 1.4(c), which include intelligence activities (including covert action),

intelligence sources and methods, or cryptology; and Section 1.4(g), which include

vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or

protection services relating to the national security.

20. In my role as a TOP SECRET classification authority, I have reviewed the

NSA information responsive to the Plaintiff's FOIA request to the NSA. For the

following reasons, I have determined that certain information (marked with the (b)(1)

exemption code) withheld in NSA/CSS Policy 1-58 is currently and properly classified at

the SECRET level in accordance with E.O. 13526. Accordingly, the release of this

information could reasonably be expected to cause serious damage to the national

security.

21.  The information in NSA/CSS Policy 1-58 that was withheld under Exemption 1, if released, would reveal operational details of NSA's implementation of the CNCI. The release of any of this information would reveal information about NSA's capabilities and limitations, and such a revelation could assist our adversaries in undermining NSA's cyberspace mission.

22.  Further, any public disclosure of the details by which NSA leverages the capability of the agency to respond to cyber-threats (be they specific SIGINT or IAD capabilities), how NSA disseminates threat, vulnerability, mitigation and warning information, how NSA assists DHS in the performance of its cyber-mission, how NSA ensures the security of US government national security systems, and how NSA protects the security of our own systems would alert our adversaries to our capabilities in cyberspace.  Revelation of this sort of information would reasonably be expected to cause our adversaries to change the methods that they use and thus thwart our efforts to identify vulnerabilities and mitigate them and to assist others with this task.

23.  Thus, disclosing any operational or amplifying details of NSA's implementation of the CNCI, which is the information withheld by NSA in Policy 1-58, would provide our adversaries with critical information about the capabilities and limitations of NSA.  Accordingly, any operational or amplifying details of NSA's implementation of the CNCI are exempt from disclosure, as indicated by the (b)(1) markings in NSA/CSS Policy 1-58, by Exemption 1 of the FOIA because the information is currently and properly classified in accordance with E.O. 13526.

## **FOIA EXEMPTION THREE**

24.  Section 552(b)(3) of the FOIA provides that the FOIA does not require the release of matters that are specifically exempted from disclosure by statute, provided that such statute requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or established particular criteria for withholding or refers to particular types of matter to be withheld. *See* 5 U.S.C. sec. 552(b)(3).  Review of the application of Exemption 3 statutes consists solely of determining that the statute relied upon qualifies as an Exemption 3 statute and that the information withheld falls within the scope of the statute.

25.  The information withheld from NSA/CSS Policy 1-58 and IAD Management Directive 20 falls squarely within the scope of several statutes.  The first of these statutes is a statutory privilege unique to NSA.  As set forth in section 6 of the National Security Agency Act of 1959, Public Law 86-36 (50 U.S.C. § 402 <u>note</u>) ("Section 6"), **"[n]othing in this Act or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, [or] of any information with respect to the activities thereof. . . . "** (Emphasis added).  Congress, in enacting the language in this statute, decided that disclosure of any information relating to NSA activities is potentially harmful.  Federal courts have held that the protection provided by this statutory privilege is, by its very terms, absolute.  *See, e.g., Linder v. NSA*, 94 F. 3d 693 (D.C. Cir. 1996).  Section 6 states unequivocally that, notwithstanding <u>any</u> other law, including the FOIA, NSA cannot be compelled to disclose <u>any</u> information with respect to its activities.  *See Hayden*, 608 F.2d at 1389.  Further, while in this case the harm would be serious, NSA is not required to demonstrate specific

harm to national security when invoking this statutory privilege, but only to show that the information relates to its activities. *Id.* at 1390. To invoke this privilege, NSA must demonstrate only that the information it seeks to protect falls within the scope of section 6. NSA's functions and activities are therefore protected from disclosure regardless of whether or not the information is classified.

26. The second applicable statute is 18 U.S.C. § 798. This statute prohibits the unauthorized disclosure of classified information: (i) concerning the communications intelligence activities of the United States; or (ii) obtained by the process of communication intelligence derived from the communications of any foreign government. The term "communications intelligence," as defined by 18 U.S.C. § 798(b), means all procedures and methods used in the interception of communications and the obtaining of information from such communications by other than the intended recipients.

27. The third applicable statute is Section 102A(i)(l) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-1(i)(1), which states that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." NSA, as a member agency of the U.S. intelligence community, must also protect intelligence sources and methods. Like the protection afforded to core NSA activities by Section 6 of the NSA Act of 1959, the protection afforded to intelligence sources and methods is absolute. *See Central Intelligence Agency v. Sims*, 471 U.S. 159 (1985). Whether the sources and methods at issue are classified is irrelevant for purposes of the protection afforded by 50 U.S.C. § 403-l(i)(1). *Id.*

12

28. The information at issue here, i.e. how NSA implements the CNCI, falls squarely within the scope of all three above-cited Exemption 3 statutes. Information about NSA's implementation of the CNCI directly relates to one of the Agency's core functions and activities of its Information Assurance mission, which is to assist in the protection of U.S. information systems. Likewise, this information also directly relates to NSA's SIGINT mission, which is part of NSA's role in the CNCI. Thus, revealing any operational details on how NSA implements the CNCI, would directly reveal NSA's functions and activities, which are afforded absolute protection. Accordingly, all of the information withheld in NSA/CSS Policy 1-58 and IAD Management Directive 20 is exempt pursuant to Exemption 3 based on Section 6 alone.

29. Additionally, some of the same information that is exempt based on Section 6 is also exempt under Exemption 3 based on 18 U.S.C. § 798, because disclosure would reveal classified information derived from NSA's exploitation of foreign communications, and based on 50 U.S.C. § 403-1(i)(1), because the information concerns intelligence sources and methods.

## NSPD 54

30. As discussed above, the Agency identified NSPD-54 as being a document responsive to item #1 of the Plaintiff's FOIA request. This document did not originate with NSA, but rather, it originated with the National Security Council (NSC) and Homeland Security Council (HSC).

31. NSPD 54 reflects – as its name indicates – direction from the President himself on sensitive and national security topics. NSPD 54 was issued by the President and included Presidential direction on specific actions to be undertaken by the federal

13

government to safeguard federal cybersecurity.  This direction was issued to a number of

high ranking Presidential advisers, Cabinet officials, and agency heads, including (*inter*

*alia*) the Director of NSA.

32. NSPD 54 clearly reflected the President's concern with the confidentiality of

the document.  In a Memorandum accompanying NSPD 54 (dated 9 January 2008), the

White House instructed all recipients of NSPD 54 to refer all public requests for

disclosure of NSPD-54 to the NSC and HSC.  The Memorandum makes explicitly clear

that a recipient of NSPD 54 *should not* distribute or disclose the document without

express permission from the White House.

33. Further, NSA is restricted in disseminating NSPD-54 even within the NSA;

the Memorandum accompanying NSPD 54 forbids such intra-agency distribution except

on a need to know basis.  Explicit White House permission is further required before

redistributing NSPD-54 to overseas organizations within the Agency or to other

Governmental agencies/organizations.

34. Although this document can be withheld in its entirety based on Exemption 5

(presidential communication privilege), NSA has withheld one paragraph in this

document which pertains to its activities based on Exemption 1 of the FOIA because the

information is currently and properly classified in accordance with E.O. 13526 and

Exemption 3 because the information is protected by statutes:  Section 6 of the National

Security Agency Act of 1959, 50 U.S.C. § 402 note (Pub. L. 86-36) and Section

102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C.

§403-1(i)(1).

**NSA'S DETERMINATION THAT IT COULD NOT LOCATE RECORDS RESPONSIVE TO ITEM #2 OF PLAINTIFF'S FOIA REQUEST**

35.   In item #2 of its FOIA request, Plaintiff sought "The full text, including unreported sections, of the Comprehensive National Cybersecurity Initiative, as well as any executing protocols distributed to the agencies in charge of its implementation." As stated above, the CNCI was implemented in NSPD-54, which is a White House privileged document. As such, any unreported sections of the CNCI, if they exist, would not be subject to the FOIA. Although, as noted herein, the NSA has a copy of NSPD 54 – and thus, has a copy of those sections of the NSPD 54 related to the CNCI – the "full text" of the CNCI is subject to withholding because the entire NSPD 54 document (including the sections related to the CNCI) is subject to withholding under the presidential communications privilege.

36.   Likewise, regarding the Plaintiff's request for "executing protocols" that were "distributed" to the agencies who have implemented the CNCI (item #2 in Plaintiff's FOIA request), such "executing protocols," if they exist, would be White House records, not NSA records. Further, a reasonable search uncovered no such documents in NSA's possession when the NSA searched for responsive records by giving plain meaning to Plaintiff's request and thus searched for "Executing protocols" that were "distributed to" to the NSA – meaning, protocols that emanated from outside the NSA and were "distributed to" NSA. The Agency conducted its searches in June and July 2009 within the relevant NSA organizations and including the Signal Intelligence Directorate and Information Assurance Directorate organizations. NSA concluded that any directives on how to execute the CNCI would have been received by the organizations who conducted

15

the search because they would be executing aspects of the CNCI. The search for records responsive to item #2 was conducted by the same organizations that searched for records responsive to item #3 of the Plaintiff's FOIA request, but none of them located any such "executing protocols" that were "distributed" to NSA except for NSPD 54, which was also responsive to item #1 of the Plaintiff's request.

37. Giving plain meaning to Plaintiff's request, the NSA's search that was conducted in June/July 2009 did not locate any protocols from outside the agency (other than NSPD 54 itself) directing the NSA as to how it was to implement NSPD 54, although these searches produced records responsive to item #3 of the Plaintiff's FOIA request. Accordingly, those organizations were asked to search all files for any documents that had been distributed to NSA on how to execute the CNCI. None of these organizations located any such responsive executing protocols.

38. Based on the above, it is my determination that NSA conducted a reasonable search but did not locate any records that were responsive to item #2 of the Plaintiff's FOIA request.

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed this 11 day of October 2011 pursuant to 28 U.S.C. § 1746.

DIANE M. JANOSEK
Deputy Associate Director for Policy and Records
National Security Agency