**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELECTRONIC PRIVACY **)** | |
| INFORMATION CENTER ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:10-cv-00196-BAH |
| ) | |
| THE UNITED STATES NATIONAL ) | |
| SECURITY AGENCY ) | |
| ) | |
| Defendant. ) | |
| ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF**
**PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff the Electronic Privacy Information Center ("EPIC") opposes Defendant U.S.

National Security Agency's ("NSA") October 11, 2011 Motion for Summary Judgment, and

cross-moves for summary judgment in favor of EPIC.

Specifically, EPIC challenges the NSA's withholding of documents, in full and in part, in

response to EPIC's Freedom of Information Act ("FOIA") request seeking disclosure of National

Security Presidential Directive 54 ("NSPD 54") and related agency records.

As discussed below, the Court should order the NSA to disclose NSPD 54 and related

agency records because:

1)    The agency's Exemption 5 claim is based on the presidential communications
      privilege, which has not been properly invoked;

2)    Even assuming that the presidential communications privilege was properly
      invoked, NSPD 54 is not subject to the privilege and the public's interest in
      disclosure outweighs the agency's interest in secrecy;

3)    The agency seeks to withhold portions of records under Exemption 1 that are not
      properly classified;

4)   The agency's Exemption 3 claim is predicated on its improper Exemption 1 claim;

5)   The agency improperly represented that responsive records were not responsive to section 2 of EPIC's FOIA Request.

## FACTUAL BACKGROUND

I.   **NSPD 54 and Related Documents are Agency Records in the Possession of the NSA**

In January 2008, President George W. Bush issued NSPD 54, but did not release the text of the directive to the public. US Government Accountability Office, *Progress Made but Challenges Remain in Defining and Coordinating the Comprehensive National Initiative*, Mar. 2010 at 9, *available at* www.gao.gov/new.items/d10338.pdf. The directive established the Comprehensive National Cybersecurity Initiative ("CNCI"). NSPD 54 "established 12 CNCI projects and identified lead agencies for each." *Id*. at 17.

The NSA has exercised substantial cybersecurity policy authority since NSPD-54 was issued. *See* National Security Council, *The Comprehensive National Cybersecurity Initiative*, http://www.whitehouse.gov/cybersecurity/comprehensive-national-cybersecurity-initiative (describing the NSA's actions to execute "[CNCI] Initiative #3. Pursue Deployment of Intrusion Prevention Systems Across the Federal Enterprise."). The agency has sought increased authority to engage in covert cybersecurity activities. James Risen and Eric Lichtblau, *Control of Cybersecurity Becomes Divisive Issue*, N.Y. Times, Apr. 16, 2009 ("The National Security Agency has been campaigning to lead the government's rapidly growing cybersecurity programs, raising privacy and civil liberties concerns among some officials who fear that the move could give the spy agency too much control over government computer networks."). In March 2009, the head of the Department of Homeland Security ("DHS") National Cybersecurity Center, Rod

Beckstrom, resigned, stating that the NSA has gained tremendous influence over federal cybersecurity operations. Mr. Beckstrom asserted that the "NSA effectively controls DHS cyber efforts through…technology insertions," and the proposed move of two DHS entities organizations to a Fort Meade NSA facility. Letter from Rod Beckstrom, Director, National Cybersecurity Center, to Secretary Janet Napolitano, Secretary, Department of Homelands Security (Mar. 5, 2009) *available at* http://epic.org/linkedfiles/ncsc_directors_resignation1.pdf.

The Administration and the Department of Homeland Security have discussed at length in public settings the content, purpose, and scope of the CNCI, but have failed to release to the public the underlying document. *E.g.* National Security Council, *The Comprehensive National Cybersecurity Initiative*, http://www.whitehouse.gov/cybersecurity/comprehensive-national-cybersecurity-initiative; Department of Homeland Security, *Protecting Our Federal Networks Against Cyber Attacks*, Jun. 4, 2009, http://www.dhs.gov/files/programs/gc_1234200709381.shtm.

The NSA conceds that the agency is in possession of NSPD 54 and related records. NSA Motion for Summary Judgment (Dkt. No. 12) ("Defendant's Motion").

## II.    EPIC's FOIA Request

On June 25, 2009, EPIC filed a FOIA request with the NSA ("EPIC's FOIA Request"). EPIC's request sought:

1. The text of the National Security Presidential Directive 54 otherwise referred to as the Homeland Security Presidential Directive 23;

2. The full text, including previously unreported sections, of the Comprehensive National Cybersecurity Initiative, as well as any executing protocols distributed to the agencies in charge of its implementation; and

3. Any privacy policies related to either the Directive, the Initiative, including by not limited to, contracts or other documents describing privacy policies for information

shared with private contractors to facilitate the Comprehensive National
Cybersecurity Initiative. .

EPIC's FOIA Request further asked for expedited processing, news media fee status, and a fee
waiver, pursuant to well settled law and similar cases in which EPIC was a FOIA requester.

### III.    THE NSA Withheld Agency Records Responsive to EPIC's FOIA Request

The NSA acknowledged receipt of EPIC's FOIA Request on July 1, 2009, and assigned it
case number 58987. The NSA granted EPIC's request for news media fee status and for a fee
waiver, but denied EPIC's request for expedited processing. The NSA did not make a substantive
determination as to EPIC's FOIA Request. On July 30, 2009, EPIC filed an administrative
appeal with the NSA, seeking review of the denial of expedited processing and the Agency's
non-responsiveness within the FOIA's deadlines ("EPIC's First Appeal"). The NSA responded
to EPIC's First Appeal by letter dated August 12, 2009, granting EPIC's request for expedited
processing.

On August 14, 2009, the NSA wrote to EPIC, stating that the agency's search for
documents was complete. The NSA transmitted two records that were responsive to category 3
of EPIC's FOIA Request. The NSA claimed that redacted material within the documents
consisted of classified information, exempt under FOIA Exemption 1, and information that was
statutorily protected from release, exempt under FOIA Exemption 3. The NSA stated that the
agency was reviewing other responsive documents for release.

The NSA sent EPIC a further response on October 26, 2009, stating that the agency
found no records in response to category 2 of EPIC's FOIA Request, and three additional
documents were found in response to categories 1 and 3. Of the three documents, the agency
withheld two in their entirety, alleging that the records were exempt under FOIA Exemption 5 as
part of the "predecisional deliberative process." The agency also asserted that one of the records

was properly classified and therefore exempt under FOIA Exemption 1. The agency claimed that portions of both documents were also exemption under FOIA Exemption 3. The agency withheld the third responsive document, allegedly because it did not originate with the NSA. The NSA wrote, "the subject document has been referred to the National Security Council for review and direct response to you."

EPIC submitted a second administrative appeal to the NSA on November 24, 2009 ("EPIC's Second Appeal"). EPIC's Second Appeal challenged the NSA's failure to disclose the third responsive record identified in the agency's October 26, 2009 response. The NSA alleged that the record was properly withheld because it "did not originate with the agency," despite the fact that the originating entity (in this case, the National Security Council ("NSC")), was not an agency within the meaning of the FOIA. EPIC further appealed the NSA's determination that there were no responsive documents to category 2 of EPIC's FOIA Request, as well as the NSA's full withholding of the two documents in response to category 3. The NSA acknowledging receipt of EPIC's Second Appeal on December 18, 2009.

**IV. EPIC Filed the Present Lawsuit, Challenging the NSA's Withholdings**

EPIC filed the immediate action in United States District Court for the District of Columbia on February 4, 2010 ("EPIC's Complaint"). EPIC's complaint charged the NSA with a failure to comply with statutory deadlines and a failure to disclose responsive agency records ("Count One" and "Count Two"). In addition, EPIC brought a claim against the National Security Council for failure to disclose responsive agency records ("Count Three"). Finally, EPIC brought a claim for violations of the Administrative Procedure Act ("APA") for the NSA's referral of part of EPIC's FOIA Request to the NSC, an entity that was not subject to the FOIA ("Count Four").

On March 25, 2010, the NSA moved to dismiss EPIC's Complaint in part, specifically with regards to Count Three and Count Four. The NSA argued that the NSC was not a proper party because they are not subject to the FOIA and because EPIC has not submitted a FOIA request to the entity. EPIC opposed the NSA's motion on April 8, 2010, arguing that the NSA's referral of EPIC's FOIA Request to the NSC was improper. EPIC stated that, in the face of the agency's unlawful referral, EPIC properly sued both the NSA and NSC:

> EPIC has brought the relevant parties before the Court. Either the NSA or NSC is required to respond to EPIC's FOIA request. Dismissal of the NSC would deprive the Court of the opportunity to fully adjudicate the present dispute. Further, it would risk a result in which neither the NSA nor the NSC is required to respond to EPIC's FOIA request. Such an outcome violates the FOIA and basic principles of fairness.

This Court granted the NSA's partial motion to dismiss on July 7, 2011, but ruled "the NSA's referral of the FOIA request to the NSC does not relieve the NSA of its continuing obligation to respond to the request" and held that EPIC may "pursue its claim against the NSA for wrongfully withholding an agency record in its possession." EPIC's claims under Count One and Count Two are the topic of the immediate Opposition and Cross-Motion for Summary Judgment.

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to the material facts, and the moving party demonstrates it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). FOIA lawsuits are typically resolved on cross-motions for summary judgment. *Reliant Energy Power Generation v. FERC*, 520 F. Supp. 2d 194, 200 (D.D.C. 2007). A court reviews agency handling of a FOIA request *de novo*. 5 U.S.C. § 552(a)(4)(B).

The U.S. Supreme Court "repeatedly has stressed the fundamental principle of public access to Government documents that animates the FOIA." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151-52 (1989). "In enacting FOIA, Congress struck the balance it thought right--generally favoring disclosure, subject only to a handful of specified exemptions--and did so across the length and breadth of the Federal Government." *Milner v. Dep't of the Navy*, 131 S. Ct. 1259, 1266 (2011). As the Court has previously explained, "[t]he basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). The FOIA's "basic purpose reflect[s] a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *U.S. Dept. of Air Force v. Rose*, 425 U.S. 352, 360-61 (1976), quoting S. Rep. No. 813, 89th Cong., 1st Sess., 3 (1965). FOIA was meant to be a "disclosure statute," not a "withholding statute." *Milner*, 131 S. Ct. at 1262. The FOIA "mandates a strong presumption in favor of disclosure." *EPIC v. Dept. of Justice*, 511 F. Supp. 2d 56, 64 (D.D.C. 2007) (internal citations omitted).

The FOIA includes exemptions from disclosure, "[b]ut these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Rose*, 425 U.S. at 361. Therefore FOIA exemptions "must be narrowly construed." *Id*. "The statute's goal is broad disclosure, and the exemptions must be given a narrow compass." *Milner*, 131 S. Ct. at 1261 (internal citations omitted). Furthermore, "the burden is on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B); *see also EPIC v. Dept. of Homeland Security*, 384 F. Supp. 2d 100, 106 (D.D.C. 2005).

**ARGUMENT**

EPIC seeks disclosure of NSPD 54 and related records that have been withheld by the NSA in response to EPIC's FOIA Request. As discussed below, the agency's asserted exemptions – FOIA Exemptions 1, 3, and 5 – do not support the agency's withholdings.

**I.       The NSA May Not Withhold NSPD 54 Pursuant to FOIA Exemption 5**

NSPD 54 was issued by former President George W. Bush, and was transmitted directly to "senior foreign policy advisors, cabinet officials, and agency heads." Decl. of Mary Ronan at ¶ 15 ("Ronan Decl."). NSPD 54 was accompanied by a transmittal memo ("the Memo"), signed by the Executive Secretary to the Homeland Security Committee, stating the Directive required "careful safeguarding," requiring White House approval for dissemination beyond authorized recipients, but allowing copies to be distributed within receiving agencies on a "need to know basis." Defendant's Motion at 10; Ronan Decl. at ¶ 7.

The NSA's Motion for Summary Judgment asserts that the agency properly withheld the text of NSPD 54 pursuant to FOIA Exemption 5. Defendant's Motion at 7. However, the agency does not argue that NSPD 54 is a pre-decisional record of the sort that is typically exempt under Exemption 5. *Id.* at 9 (conceding that NSPD 54 is a "post-decisional" agency record). Instead, Defendant's Motion contends that NSPD 54 qualifies for Exemption 5 protection because it is subject to the presidential communications privilege. *Id.* at 7-8.  But neither President Bush nor his successor, President Barack Obama, personally asserted the presidential communications privilege as to NSPD 54. Such a personal assertion is required to support valid invocation of the privilege. *Cheney v. U.S. District Court for the District of Columbia*, 542 U.S. 367, 389 (2004); *Citizens for Responsibility & Ethics in Washington v. U.S. Dept. of Homeland Sec.*, 532 F.3d

860, 867 (D.C. Cir. 2008). Therefore, the NSA may not withhold the text of NSPD 54 pursuant to FOIA Exemption 5.

        *a.*      *Exemption 5 Standard*

FOIA Exemption 5 protects from mandatory disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency.  5 U.S.C. § 552(b)(5). The exemption was added to the FOIA to protect "those documents that are normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 149 (1975). The exemption is to be applied "as narrowly as consistent with efficient Government operation." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980) (citing S. Rep. No. 89-813 (1965)). The NSA concedes that NSPD 54 is not a "pre-decisional." Defendant's Motion at 9 ("NSPD 54 is a confidential post-decisional communication from the President to senior officials of his administration."). Therefore the standard Exemption 5 rationale does not support the NSA's withholding of NSPD 54.

FOIA Exemption 5 also permits an agency to withhold documents subject to the presidential communications privilege. "Documents that are subject to…the presidential communications privilege can be withheld pursuant to Exemption 5." *Citizens for Responsibility and Ethics in Washington v. Dept. of Homeland Security*, 2008 WL 2872183 at *2 (D.D.C. July 22, 2008); *see also Judicial Watch, Inc. v. Dept. of Justice*, 365 F.3d 1108 (D.C. Cir. 2004) ("Exemption 5 also has been construed to incorporate the presidential communications privilege").

b.   *The Presidential Communications Privilege Must be Personally Invoked,
     and is a Qualified Privilege*

The President or Vice-President must personally invoke the presidential communications privilege. "Unlike the deliberative process privilege, which is a general privilege that applies to all executive branch officials, the presidential communications privilege is specific to the President …" *Judicial Watch v. Dept. of Justice*, 365 F.3d 1108, 1113-14 (D.C. Cir. 2004). The privilege was first vigorously litigated in the 1970s, when President Nixon personally invoked it in response to lawsuits seeking tapes and documents generated by his administration. *See In re Sealed Case*, 121 F.3d at 742. In *Cheney v. U.S. District Court for the District of Columbia*, the Supreme Court contemplated that Vice President Cheney would be required to personally invoke the communications privilege in response to a civil discovery order. *Cheney*, 542 U.S. at 389 (discussing the burden imposed by the prospect of the "Vice President winnow[ing] the discovery orders by asserting specific claims of privilege and making more particular objections").

Following *Cheney*, the D.C. Circuit acknowledged the burden imposed by discovery obligations that "require the President, Vice President, or their staffs to sort through mountains of files for responsive documents" as a predicate for personally asserting the presidential communications privilege. *Citizens for Responsibility & Ethics in Washington v. U.S. Dept. of Homeland Sec.*, 532 F.3d 860, 867 (D.C. Cir. 2008) (noting that "the burden of processing the records and asserting exemptions would fall squarely on the President, the Vice President, and their senior advisors - the only people with the information necessary to make the requisite privilege determinations"). But the D.C. Circuit held that "the burden on the White House or Office of the Vice President to decide whether to claim Exemption 5 over any responsive records

should prove minimal" when a "FOIA request is narrowly drawn." *Id*. "Indeed," the D.C. Circuit

observed, "the President has routinely invoked Exemption 5 in other FOIA cases." *Id*.

President Obama acknowledges that the presidential communications privilege must be

personally invoked. On his first full day in office, President Obama issued Executive Order

13489. Exec. Order No. 13233, 3 C.F.R. 815 (2001). The Executive Order details the specific

process through which a President must personally invoke the privilege. *See* Exec. Order No.

13,489, 3 C.F.R. 191 (2009) (stating, "If the President decides to invoke executive privilege, the

Counsel to the President shall notify the former President, the Archivist, and the Attorney

General in writing of the claim of privilege and the specific Presidential records to which it

relates. After receiving such notice, the Archivist shall not disclose the privileged records unless

directed to do so by an incumbent President or by a final court order.").

Furthermore, even when the presidential communications privilege is personally invoked,

the privilege is qualified - it can be overcome by a focused demonstration of need. *In re Sealed

Case*, 121 F.3d at 746. Further, "the privilege is limited to communications in performance of a

President's responsibilities, of his office, and made in the process of shaping policies and making

decisions." *Nixon v. Administrator of General Services,* 433 U.S. 425, 449 (1977) (internal

citations omitted); *see also United States v. Nixon*, 483 U.S. 683 (1974). Former presidents may

assert the presidential privilege of confidentiality, but the claim is given less weight than that of

an incumbent President. *See In re Sealed Case*, 121 F.3d at 744 ("a former President could assert

the privilege on his own, but his claim would be given less weight than that of an incumbent

president"); *see also Nixon v. Administrator of General Services,* 433 U.S. 425, 439 (1977).

c.      *Neither President Bush nor President Obama Personally Invoked the Presidential Communications Privilege as to NSPD 54*

Though Defendant's Motion alleges that "the President has explicitly sought to maintain the confidentiality of the decisions embodied in NSPD 54," the agency does not allege that either President Bush or President Obama asserted the presidential communications privilege as to NSPD 54.[1] Nor does Defendant's Motion establish that the term "confidential" was used either by President Bush within the Directive or in the text of the Memo. Instead, the agency relies on the post-hoc Janosek and Ronan Declarations, which merely state legal conclusions. Defendant's Motion, at 2, 7-12; Janosek Decl. at ¶ 34 ("Although this document can be withheld in its entirety based on Exemption 5 (presidential communications privilege)…"); Ronan Decl. at ¶ 13 ("NSPD-54 should be withheld in full under FOIA exemption b(5)"). Because the agency has presented no proof that the President, as the author of the Directive, either personally invoked the privilege or specifically authorized another to do so, the Court should find that the presidential communications has not been properly invoked as to NSPD 54.

d.      *If the Court Holds that NSPD 54 was Properly Invoked, NSPD 54 Does Not Fall Within the Presidential Communications Privilege*

The presidential communications privilege is grounded "in the President's need for confidentiality in the communications of his office." *Judicial Watch, Inc.*, 365 F.3d at 1115 (internal citations omitted); *see also In re Sealed Case*, 121 F.3d at 743 ("a presumptive privilege for Presidential communications, founded on a President's generalized interest in confidentiality.") (internal citations omitted). The privilege "covers final and post-decisional materials as well as pre-deliberative ones." *In re Sealed Case*, 121 F.3d at 745. However, "the

---

[1] In EPIC's view, the Homeland Security Council Executive Secretary does not have the authority to assert the presidential communications privilege in the Memo absent an express delegation of Presidential authority to do so. Because the Memo does not explicitly invoke the privilege, EPIC's brief does not discuss the impropriety of such an invocation.

presidential communications privilege should be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decision-making process is adequately protected. *Id*. at 1116 (internal citations omitted).

The NSA argues that the agency may withhold NSPD 54 because the directive "is a confidential post-decisional communication from the President to senior officials of his administration." However, NSPD 54 has been disclosed too expansively to qualify for the presidential communications privilege. In addition, NSPD 54 is no simple communication from the President. "A presidential directive has the same substantive legal effect as an executive order." *Memorandum for the Counsel Counsel to the President* (January 29, 2000), http://www.justice.gov/olc/predirective.htm. That is to say, "the substance of a presidential determination or directive [] is controlling." *Id*.

A previous case before this Court provides important guidance on the appropriate scope of the privilege:

> The presidential communications privilege does not apply to *every* presidential decision-making process, however. The D.C. Circuit has only provided for a "limited" extension of the privilege "down the chain of command" to the President's "immediate White House advisors" and their staff.

*EPIC v. Dept. of Justice*, 584 F. Supp. 2d 65, 80 (D.D.C. 2008) (citing *Judicial Watch v. U.S. Dept. of Justice*, 365 F.3d at 1115-16) (emphasis in original). By contrast, NSPD 54 has been shared with "senior foreign policy advisors, cabinet officials, and agency heads." Ronan Decl. at ¶ 5. The D.C. Circuit has clearly held that "the privilege should not extend to staff outside the White House in executive branch agencies." *In re Sealed Case*, 121 F.3d at 752. The NSA concedes that copies of NSPD 54 were distributed "on a need to know basis" within numerous federal agencies. Ronan Decl. at ¶ 7 (discussing the contents of the transmittal memo to NSPD

54, penned by the Executive Secretary of the Homeland Security Committee). Despite its origins

in the office of the President, the disclosure of NSPD 54 amongst officials in administrative

agencies, even when accompanied by a warning against wholesale publication, demonstrates less

control than the Defendant suggests. NSPD 54 was shared among and between individuals both

within and without the White House, though the presidential communications privilege is only

intended to protect "communications at that level…close enough to the President to be revelatory

of his deliberations or to pose a risk to the candor of his advisors." *Id*.

    Defendant argues that Presidential Directives should be withheld from public disclosure

under the FOIA pursuant to the presidential communications privilege. However, the presidential

communications privilege is not routinely used to shield the contents of a presidential directive

or executive order. In fact, the primary invocation of the privilege has been in the context of

deliberations and investigations within the executive branch. *See, e.g., Judicial Watch, Inc. v.*

*National Energy Policy Development Group*, 219 F. Supp. 2d at 20 (stating that more

information was needed to determine if the privilege covered meetings and minutes of the

National Energy Policy Development Group); *In re Sealed Case*, 121 F.3d at 121 (applying the

privilege to documents pertaining to the White House Counsel's investigation of the former

Secretary of Agriculture); *Citizens for Responsibility and Ethics in Washington*, 2008 WL

2872183 (upholding the assertion of the presidential communications privilege to records

pertaining to the Federal Emergency Management Agency's preparation for and response to

Hurricane Katrina); *Judicial Watch, Inc. v. Dept. of Justice*, 365 F.3d at 1108 (upholding the

presidential communications privilege only to internal pardon documents that were both solicited

and received by the President or his Office.).

Courts have warned of the dangers of expanding the presidential communications privilege. *See Judicial Watch, Inc. v. National Energy Policy Development Group*, 219 F. Supp. 2d at 52 ("the very reason that presidential communications deserve special protections, namely the President's unique powers and profound responsibilities, is simultaneously the very reason why securing as much public knowledge of presidential actions as is consistent with the needs of governing is of paramount importance.") (*quoting In re Sealed Case,* 121 F.3d at 749); *Judicial Watch, Inc. v. Dept. of Justice*, 365 F.3d at 1122 ("Courts have long been hesitant to extend the presidential communications privilege so far, for ours is a democratic form of government where the public's right to know how its government is conducting business has long been an enduring and cherished value."). Since the presidential communications privilege is absolute, and covers not only deliberative and draft documents, but also final and post-decisional materials, it presents the real risk that documents that will have significant and wide-spread impact may be kept totally hidden. To apply the presidential communications privilege to NSPD 54 would bring about the very dangers of which the Court warns: it would allow for the creation of "secret law," the very thing that the FOIA seeks to prevent. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 137-138 (1975).

Finally, the presidential communications privilege is not appropriately invoked in this case because NSPD 54 falls outside of the President's constitutional authority. *See In re Sealed Case*, 121 F.3d at 744. The presidential communications privilege protects communications made within the President's role to "take Care that the Laws be faithfully executed." U.S. Const. Art. II, Sec. 3, Cl. 4; *See also Committee on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 75 (D.D.C. 2008) ("that suit was not brought pursuant to the Executive's duty to execute the laws."). "In the framework of our Constitution, the President's power to see

that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). Common law and practice allows Congress to delegate power to the Executive, requiring Congress to "lay down…an intelligible principle to which the person or body authorized to act is directed to conform. *Whitman v. American Trucking Assn., Inc.*, 531 U.S. 457, 458 (2001).

By Defendant's admission, NSPD 54 provides "specific directions to high ranking government officials to take discrete steps with regard to cybersecurity." Janosek Decl. at ¶ 8. The document also both sets out and implements the Comprehensive National Cybersecurity Initiative ("CNCI"). *Id*.; Defendant's Motion at 23. It is clear that NSPD 54 sets policy and mandates action, two functions that are reserved to the legislative branch of government. The NSA does not at any point provide a citation in which the legislative authority for NSPD 54 is rooted. It is possible that the Directive makes explicit reference to the authority it is mandated under, however, since the NSA has withheld the document in full and refuses to release a segregated version, it is impossible to know. Instead, the Defendant blindly asserts that one of the President's "core constitutional duties" is the "development of a coordinated strategy within the Executive Branch to protect the nation from cyber security risks." Ronan Decl. at ¶ 14. EPIC is at a loss for where this "core duty" is found in the United States Constitution.

      e.     *If the Court Holds that NSPD 54 is Subject to the Presidential Communications Privilege, Public Release of NSPD 54 is Sufficiently Important so as to Override the Privilege*

It is well established that the presidential communications privilege is "qualified, not absolute, and can be overcome by an adequate showing of need." *In re Sealed Case*, 121 F.3d at 745. When a party demonstrates need, the court must "review the documents *in camera* to excise non-relevant material [and] the remaining relevant material should be released." *Id*. Because NSPD 54 was originally authored by former President George W. Bush, it is also important to note that "a former President [can] assert the privilege on his own, but his claim [is] given less weight than that of an incumbent President." *In re Sealed Case*, 121 F.3d at 744, citing *Nixon v. Administrator of General Services*, 433 U.S. 425, 449.

Courts have found "adequate need" sufficient to override the presidential communications privilege in a variety of circumstances, holding that records must be disclosed to archivists, civil plaintiffs, and for use in criminal trials. *Nixon v. Administrator of General Services*, 433 U.S. 425, 450-455 (the screening of materials by archivists was a "very limited intrusion" and justified in light of substantial public interests.); *In re Sealed Case*, 121 F.3d at 743, *quoting Sun Oil Co. v. United States*, 514 F.2d 1020, 1024 (Ct. Cl. 1975) ("presidential communications privilege could be overcome by the evidentiary demands of a civil trial"); *Dellums v. Powell*, 561 F.2d 242, 247 (D.C. Cir. 1977) (privilege could be overcome by an adequate showing of need in a civil trial where "… there has been sufficient evidentiary substantiation to avoid the inference that the demand reflects mere harassment"); *U.S. v. Nixon*, 418 U.S. at 712  ("materials sought for use in a criminal trial," when weighed against "a generalized need for confidentiality").

The contents of NSPD 54 demonstrate the necessity of disclosure, the public benefit to be gained from disclosure, and the harm that will be inflicted on EPIC and the public if the NSA is permitted to keep secret the directive. NSPD 54 is the basis for the federal government's cybersecurity authority. Defendant's Motion at 3. NSPD 54 contains the full text of the CNCI. *Id*. at 23. Information published by the White House concerning both the Directive and the CNCI demonstrate that the documents serve as the basis for recently developed government policies, including the White House Cybersecurity Legislative Proposal,[2] the National Strategy for Trusted Identities in Cyberspace,[3] and the U.S. International Strategy for Cyberspace.[4] Even though the NSA seeks to withhold NSPD 54 in its entirety, one of the documents that was derived from NSPD 54, the White House Cyberspace Policy Review,[5] states the President's declared intent to "make transparency a touchstone of his presidency." *The Comprehensive National Cybersecurity Initiative*, The White House,

---

[2] *See* Press Release, White House, Fact Sheet: Cybersecurity Legislative Proposal (May 12, 2011), *available at* http://www.whitehouse.gov/the-press-office/2011/05/12/fact-sheet-cybersecurity-legislative-proposal. Full text of proposal *available at* http://www.whitehouse.gov/sites/default/files/omb/legislative/letters/law-enforcement-provisions-related-to-computer-security-full-bill.pdf.

[3] *See* Press Release, White House, Administration Releases Strategy to Protect Online Consumers and Support Innovation and Fact Sheet on National Strategy for Trusted Identities in Cyberspace (April 15, 2011), *available at* http://www.whitehouse.gov/the-press-office/2011/04/15/administration-releases-strategy-protect-online-consumers-and-support-in. Full text of document *available at* http://www.whitehouse.gov/sites/default/files/rss_viewer/NSTICstrategy_041511.pdf.

[4] *See* Howard A. Schmidt, *Launching the U.S. International Strategy for Cyberspace*, White House Blog (May 16, 2011 03:46 PM), http://www.whitehouse.gov/blog/2011/05/16/launching-us-international-strategy-cyberspace. Full text of document *available at* http://www.whitehouse.gov/sites/default/files/rss_viewer/internationalstrategy_cyberspace.pdf.

[5] *See* Press Release, White House, Fact Sheet: Cyberspace Policy Review: Assuring a Trusted and Resilient Information and Communications Infrastructure (May 29, 2009), *available at* http://www.whitehouse.gov/the-press-office/cybersecurity-event-fact-sheet-and-expected-attendees. Full text of document *available at* http://www.whitehouse.gov/assets/documents/Cyberspace_Policy_Review_final.pdf.

http://www.whitehouse.gov/cybersecurity/comprehensive-national-cybersecurity-initiative (last visited Nov. 3, 2011).

Cybersecurity is also a current, critical focus for lawmakers. No fewer than 39 bills are currently pending in the Senate and the House of Representatives concerning cybersecurity, *See*, *e.g.* S. 413, 112th Cong. (2011); H.R. 174, 112th Cong. (2011); H.R. 1136 , 112th Cong. (2011); S. 8 , 112th Cong. (2011). These legislative proposals have produced many Congressional hearings, with legal, policy, and technical experts from across the country coming to testify in sessions open to the press and the public, concerning matters of widespread public concern. *See, e.g.*, *Cybersecurity: Innovative Solutions to Challenging Problems Before the Senate Comm. on the Judiciary*, 112th Cong. (2011); *Cybersecurity: Evaluating the Administration's Proposals Before the SubComm. on Crime and Terrorism of the Senate Comm. on the Judiciary*, 112th Cong. (2011); *Cybersecurity: Threats to the Financial Sector Before the House Comm. on Financial Services*, 112th Cong. (2011).

Despite the administration's stated commitment to government transparency and demonstrated interest in creating a cohesive cybersecurity policy, NSPD 54 has not been made public. Members of Congress have criticized this withholding. In a letter to former DHS Secretary Michael Chertoff, Senator Joseph I. Lieberman and Senator Susan M. Collins expressed concern about the lack of information shared with the public, Congress, and other stakeholders. Letter from Senator Joseph I. Lieberman, Chairman, Senate Comm. on Homeland Security and Governmental Affairs, and Senator Susan M. Collins, Ranking Member, Senate Comm. on Homeland Security and Governmental Affairs, to the Honorable Michael Chertoff, Secretary, U.S. Dept. of Homeland Security (May 1, 2008), *available at* http://hsgac.senate.gov/public/_files/5108LiebermanCollinslettertoChertoff.pdf.

The White House and executive agencies recognize the public's interest in the transparency of government functions. Courts have long recognized that the public has a right to be informed. *See*, *e.g.*, *Getman v. NLRB*, 450 F.2d 670 (D.C. Cir. 1971) ("Exemption (6) requires a court reviewing the matter de novo to balance the right of privacy affected individuals against the right of the public to be informed."); *Retired Officers Assn. v. Dept. of Navy*, 744 F. Supp. 1 (D.D.C. 1990) ("court will balance right of privacy of affected persons against right of public to be informed and balance will tilt in favor of disclosure."); *Columbia Broadcasting System, Inc. v. Democratic Nat. Committee*, 412 U.S. 94 (1973) ("the basic criterion governing use of broadcast frequencies is the right of the public to be informed."). This right is of paramount importance where, as here, the public will be directly affected by the exercise of the government's authority. For example, the agency's cybersecurity policy may determine the availability and use of techniques for privacy and security, the technical standards associated with Internet connections, and the obligations of private firms to provide information to the government concerning the risks of cyber intrusion and cyber attack.

The government has already conceded that "it is possible to segregate parts of NSPD-54 that can be released consistent with FOIA exemption (b)(1) without adversely affecting the national security of the United States." Ronan Decl. at ¶ 13. As such, if the previous arguments are found unpersuasive, this court should now hold that the interest in informing the public on such a critical issue weighs in favor of *in camera* inspection of the text of NSPD 54 to determine proper segregabilty.

## II. The NSA Has Not Established that portions of NSPD 54, IAD Management Directive 20, and NSA/CSS 1-58 Are Properly Classified

Defendant's Motion argues that portions of NSPD 54 are properly classified and therefore exempt from disclosure pursuant to FOIA Exemption 1.[6] Defendant's Motion at 12-15. The NSA also argues that portions of IAD Management Directive 20 and NSA/CSS Policy 1-58 are properly classified and therefore exempt from disclosure pursuant to FOIA Exemption 1. However, the agency has not established that NSPD 54 and the related records are properly classified. Therefore, the NSA's Exemption 1 claim cannot support the NSA's withholding of these records.

To properly invoke FOIA Exemption 1, the "government must demonstrate that information is in fact properly classified pursuant to both procedural and substantive criteria." S. Rep. No. 93-100, at 6 (1974) (Conf. Rep.); *see also Goldberg v. Dept. of State*, 818 F.2d 71, 77 (D.C. Cir. 1987), *cert. denied*, 485 U.S. 904 (1988); *Lesar v. Dept. of Justice*, 636 F.2d 472, 483 (D.C. Cir. 1980); *Allen v. CIA*, 636 F.2d 1287, 1291 (D.C. Cir. 1980). The current standard for classification is embodied in Executive Order 13526. Exec. Order No. 13526. Executive Order 13526 prescribes "a uniform system for classifying, safeguarding, and declassifying national security information." *Id*. "If there is significant doubt about the need to classify information, it shall not be classified." *Id*. at Section 1.1(b).

---

[6] The Janosek Declaration alludes to the potential applicability of FOIA Exemption 3 to one paragraph of NSPD 54. Janosek Decl. at ¶ 34. However, Defendant's Motion does not assert Exemption 3 as a basis for withholding any portion of NSPD 54. Nor did the agency make such an assertion at the administrative stage of this matter. The agency must explicitly assert all exemptions. *Judicial Watch, Inc. v. U.S. Postal Service*, 297 F. Supp. 2d 252, 356-257 (D.D.C. 2004) ("When an agency refuses to disclose certain documents pursuant to a Freedom of Information Act (FOIA) exemption, it must ordinarily produce a[n] … explanation of the reasons for non-disclosure."). Because the agency has not explicitly asserted Exemption 3 as a basis for withholding any portion of NSPD 54, EPIC does not address the potential applicability of FOIA Exemption 3 to NSPD 54.

Information may only be deemed "classified" if each of the following conditions are met:

(1) an original classification authority is classifying the information;
(2) the information is owned by, produced by or for, or is under the control of the United States Government;
(3) the information falls within one or more of the categories of information [provided by the Executive Order]; and
(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify and describe the damage.

Exec. Order 13526, Section 1.1(a). Under Executive Order 13526, only the following officials

have the authority to classify information:

(1) the President and the Vice President;
(2) agency heads and officials designated by the President; and
(3) United States Government officials delegated this authority pursuant to paragraph (c) of this section.

Exec. Order 13526, Section 1.3 (a). The Executive Order gives specific instructions on the issue

of delegation of classification authority:

(1) Delegations of original classification authority shall be limited to the minimum required to administer this order. Agency heads are responsible for ensuring that designated subordinate officials have a demonstrable and continuing need to exercise this authority.
(2) "Top Secret" original classification authority may be delegated _only_ by the President, the Vice President, or an agency head or official designated pursuant to paragraph (a)(2) of this section.
(3) "Secret" or "Confidential" original classification authority may be delegated _only_ by the President, the Vice President, an agency head or official designated pursuant to paragraph (a)(2) of this section, or the senior agency official designated under section 5.4(d) of this order, provided that official has been delegated "Top Secret" original classification authority by the agency head.
(4) Each delegation of original classification authority _shall be in writing_ and the authority _shall not be redelegated_ except as provided in this order. Each delegation shall identify the official by name or position.
(5) Delegations of original classification authority shall be reported or made available by name or position to the Director of the Information Security Oversight Office.

23

Exec. Order 13526, Section 1.3(c) (emphasis added).

The NSA argues that sections of NSPD 54, IAD Management Directive 20, and NSA/CSS Policy 1-58 are properly classified. This assertion is based on the Ronan Declaration and the Janosek Declaration. Ms. Ronan is Director of the Access Management Office for the National Security Staff ("NSS"). Ms. Janosek is Deputy Associate Director for Policy and Records for the National Security Agency ("NSA"). Each state that they possess original classification authority pursuant to Executive Order 13526. *See* Ronan Decl. at ¶ 1 (stating that Ms. Ronan has been "delegated classification and declassification authority"); Janosek Decl. at ¶1 ("I am also a TOP SECRET classification authority."). Neither Ms. Ronan nor Ms. Janosek reference any basis, aside from the general authority described in the Executive Order, to support their alleged classification authorities. The NSA presents no evidence that Ms. Ronan and Ms. Janosek have been delegated classification authority by the President or Vice President, or an agency head that was first delegated such authority by the President or Vice President.

Accordingly, the NSA has not met its burden of proof on the matter of if portions of documents responsive to EPIC's FOIA Request are properly classified pursuant to Executive Order 13526. 5 U.S.C. § 552(a)(4)(B); *see also EPIC v. Dept. of Homeland Security*, 384 F. Supp. 2d 100, 106 (D.D.C. 2005) ("the burden is on the agency to sustain its action.").

### III.    The NSA Has Not Established that NSPD 54 is Properly Classified in its Entirety

As discussed above, the NSA must satisfy four conditions in order to support an Exemption 1 claim, including the requirement that "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify and describe the damage." Exec. Order

13526 at Section 1.1(a)(4). The NSA asserts, within the affidavit of Mary Ronan, that NSPD 54

"as a whole was properly classified as TOP SECRET." Ronan Decl. at ¶ 5, ¶ 8. Not only does the

Ronan Declaration fail to "identify or describe the damage" that could reasonably be expected

from the disclosure of NSPD 54, the declaration concedes that "it is possible to segregate parts of

NSPD-54 that can be released consistent with FOIA exemption (b)(1) without adversely

affecting the national security of the United States." Ronan Decl. at ¶ 13. The Ronan declaration

makes clear that there is "unclassified material contained in NSPD-54." Ronan Decl. at ¶ 14.

The Court should hold that NSPD 54 is not a classified document in its entirety, and

should order its release.

### IV. The NSA May Not Withhold NSPD 54, IAD Management Directive 20, and NSA/CSS Policy 1-58 pursuant to Exemption 3

The NSA argues that portions of NSPD 54, IAD Management Directive 20, and

NSA/CSS Policy 1-58 are exempt under FOIA Exemption 3, which permits agencies to withhold

records that are "specifically exempted from disclosure" by another federal statute "if that

statute— establishes particular criteria for withholding the information or refers to the particular

types of material to be withheld." 5 U.S.C. § 552(b)(3). and 18 U.S.C. § 798. 18 U.S.C. § 798

"prohibits the unauthorized disclosure of classified information (i) concerning the

communications intelligence activities of the United States or (ii) obtained by the process of

communication intelligence derived from the communications of any foreign government." 18

U.S.C. § 798 (2011); *see also* Defendant's Motion at 19-20. Section 798 applies only to records

that contain "classified information." Insofar as the Court holds that NSPD 54 and the related

records described above are not properly classified, the records are also not exempt under

Exemption 3 and Section 798.

**V.      The NSA Impermissibly Narrowed EPIC's FOIA Request Through a Restricted Interpretation of the Plain Language of the Request, and Wrongfully Maintained That No Responsive Documents Existed**

The FOIA "mandates a strong presumption in favor of disclosure." *EPIC v. Dept. of Justice*, 511 F. Supp. 2d 64 (internal citations omitted). An agency is required under the FOIA to release all documents that fall within the scope of the request. *See* 5 U.S.C. § 552(a)(3)(A). A request for documents under the FOIA must "reasonably describe" the records sought. *Id*. "An agency has a duty to construe a FOIA request liberally." *See Truitt v. Dept. of State,* 897 F.2d 540, 544-545 (D.C. Cir. 1990) (internal citations omitted); *Founding Church of Scientology v. NSA*, 610 F.2d 824, 836-837 (D.C. Cir. 1979); *See also* H.R. Rep. No. 93-876 at 6 (1974).

Category 2 of EPIC's FOIA Request requested "the full text, including previously unreported sections, of the Comprehensive National Cybersecurity Initiative, as well as any executing protocols distributed to the agencies in charge of its implementation." EPIC's FOIA Request at 3. The NSA has asserted, "no records responsive to [category] 2 of [EPIC's FOIA Request] were located." Letter from Pamela N. Phillips, Chief, NSA FOIA / PA Office to Mark J. Perry, EPIC (Oct. 29, 2009). EPIC appealed this determination in EPIC's Second Appeal to the NSA. However, the NSA continues to assert that "its reasonable search had not uncovered agency records responsive to the second prong of EPIC's request." Defendant's Motion at 22. However, the NSA's argument is facially inconsistent with its own admission that "the full text of the CNCI is embodied in NSPD 54." Defendant's Motion at 23. The NSA cannot plausibly assert that "the full text of the CNCI" contained in NSPD 54 is not a responsive record to EPIC's FOIA request for "the full text…of the [CNCI]."

In regard to the remaining portions of category 2 of EPIC's FOIA Request, namely "any executing protocols distributed to the agencies in charge of its implementation," the NSA

26

incorrectly construed EPIC's FOIA Request. The agency construes the request to include only documents "distributed to" the NSA. Defendant's Motion at 23. However, the request's plain language includes any executing protocols, either originating from or distributed to the NSA. The NSA's interpretation of EPIC's plainly worded FOIA Request is contrary to the FOIA and relevant case law. *See, e.g.*, *Hemenway v. Hughes*, 601 F. Supp. 1002, 1005 (D.D.C. 1985) ("the agency must be careful not to read the request so strictly that the requester is denied information the agency well knows exists in its files, albeit in a different form from that anticipated by the requester. To conclude otherwise would frustrate the central purpose of the Act."); *Cazalas v. Dept. of Justice,* 660 F.2d 612 (5th Cir. 1981) (overruling a hyper-technical response to the Plaintiff's FOIA Request).

The NSA asserts that if EPIC challenges the NSA's response to Category 2 that "such a challenge should be dismissed," on the basis that EPIC's Complaint "has not challenged the NSA's response to item two of the FOIA Request." Defendant's Motion at 22. This is incorrect. As the NSA contends, EPIC has not challenged, and does not purport to challenge here, the sufficiency of the NSA's search for agency records. Rather, EPIC believes that the agency searched for, located, reviewed, but unlawfully withheld as "unresponsive" records that are responsive to Category 2 of EPIC's FOIA Request. This claim is alleged in EPIC's Complaint in the instant case. EPIC's Complaint at 8 (Dkt. No. 1) ("the NSA violated the FOIA by failing to disclose agency records to EPIC that must be disclosed pursuant to the FOIA.").

## CONCLUSION

For the foregoing reasons, EPIC asks the Court to deny Defendant's Motion for Summary Judgment and grant EPIC's Cross-motion for Summary Judgment.

Respectfully submitted,

_____/s/ John Verdi_____

MARC ROTENBERG (DC Bar # 422825)
JOHN VERDI (DC Bar # 495764)
AMIE STEPANOVICH*
Electronic Privacy Information Center
1718 Connecticut Ave., NW
Suite 200
Washington, D.C. 20009
(202) 483-1140
*Counsel for Plaintiff*

* Ms. Stepanovich is a member of the Bar of
  the State of New York

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of November 2011, I served the foregoing
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT, CROSS-MOTION FOR SUMMARY JUDGMENT, AND REQUEST
FOR ORAL HEARING, including all exhibits and attachments, by electronic case filing
upon:

 JOSHUA WILKENFELD
 Trial Attorney
 United States Department of Justice
 Civil Division, Federal Programs Branch
 20 Massachusetts Ave. NW
 Washington, DC 20530
 Tel. (202) 305-7920
 Fax (202) 305-8470
 joshua.i.wilkenfeld@usdoj.gov

       _____*/s/ John Verdi*_____
       John Verdi
       *Counsel for Plaintiff*