**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, | |
| Plaintiff, | Civil Action No. 10-196 (BAH) |
| v. | Judge Beryl A. Howell |
| NATIONAL SECURITY AGENCY, | |
| Defendant. | |

**MEMORANDUM OPINION**

The plaintiff, Electronic Privacy Information Center ("the plaintiff" or "EPIC"), brings this action under the Freedom of Information Act, 5 U.S.C. § 552, claiming that the defendant, the National Security Agency ("the defendant" or "NSA"), wrongfully withheld responsive records to a FOIA request seeking the unredacted text of National Security Presidential Directive ("NSPD") 54 and related documents.[1]  Compl. ¶¶ 15, 55, ECF No. 1.  Pending before the Court are the defendant's Motion for Summary Judgment, ECF No. 12, and the plaintiff's Cross-Motion for Summary Judgment, ECF No. 13.  For the reasons set forth below, both motions are granted in part and denied in part.

I.    **BACKGROUND**

   A.    **Factual History**

      1.    *National Security Presidential Directive 54*

   The main document at issue here, NSPD 54, also known as Homeland Security Presidential Directive 23 ("HSPD 23"), was issued by then-President George W. Bush on

---

[1] Although not fully described in the Complaint, these related documents, as made clear in the parties' briefing, are IAD Management Directive 20 and NSA/CSS 1-58.

January 8, 2009.  Declaration of Diane M. Janosek, Deputy Associate Director for Policy and

Records, NSA, ("Janosek Decl.") ¶ 8, ECF No. 12-2.  "NSPD 54 is a confidential

communication from the President of the United States to a select and limited group of senior

foreign policy advisors, cabinet officials, and agency heads on the subject of cybersecurity

policy."  Decl. of Mary Ronan, Director of Access Management Office, National Security Staff

("Ronan Decl.") ¶ 7, ECF No. 12-10; *see also* Def.'s Mem. Supp. Mot. for Summ. J. ("Def.'s

Mem.") at 3, ECF No. 12-1.  "NSPD 54 also implemented the [Comprehensive National

Cybersecurity Initiative ("CNCI")]."  Janosek Decl. ¶ 8.  It was distributed with a "transmittal

memo" from the Homeland Security Council's Executive Secretary that "emphasized NSPD-

54's close-hold nature and the need to safeguard its content."  Ronan Decl. ¶ 7.  This transmittal

memo "prohibited dissemination of the document beyond its authorized recipients without White

House approval and further instructed that even within receiving agencies, copies should be

distributed only on a need to know basis."  *Id.*  The document is classified "Top Secret" but

includes portions that are unclassified.[2]  *Id.* ¶ 8.

### 2.    *The Plaintiff's FOIA Request*

In June 2009, the plaintiff submitted a FOIA request to the NSA seeking "National

Security Presidential Directive 54 . . . and related records" from the defendant.  Janosek Decl.

Tab A at 3, ECF No. 12-3.  Specifically, the FOIA request sought: (1) "The text of the National

Security Presidential Directive 54 otherwise referred to as The Homeland Security Presidential

---

[2] There is some dispute as to how much of, and at what level, NSPD 54 is classified.  The defendant asserts it is
withholding all of NSPD under Exemption 5 as a "presidential communication," but it also asserts that one
paragraph is being withheld under Exemption 1 "because the information is currently and properly classified in
accordance with [Executive Order] 13526 and Exemption 3 because the information is protected by statutes."
Janosek Decl. ¶ 34.  The NSC's declarant, however, states "NSPD-54 as a whole is classified as TOP SECRET.
Individual paragraphs within NSPD-54 have different classification markings ranging from UNCLASSIFIED to,
SECRET, and TOP SECRET."  Ronan Decl. ¶ 8.  It is unnecessary to determine at what level, if any, NSPD 54 is
classified because, as explained in part III.A *infra*, NSPD 54 is not an "agency record" for the purposes of the FOIA
under the D.C. Circuit's recent opinion in *Judicial Watch v. United States Secret Service*, 726 F.3d 208 (D.C. Cir.
2013).

Directive 23[;]" (2) "The full text, including previously unreported sections, of the Comprehensive National Cybersecurity Initiative, as well as any executing protocols distributed to the agencies in charge of its implementation[;]" and (3) "Any privacy policies related to either the Directive, [or] the Initiative, including but not limited to, contracts or other documents describing privacy policies for information shared with private contractors to facilitate the Comprehensive National Cybersecurity Initiative." *Id.* at 5.[3]  On August 14, 2009, the defendant released two redacted documents, USSID SP0018 and NSA/CSS Policy 1-23, responsive to the third part of the plaintiff's request that had been previously released pursuant to the FOIA.[4] Janosek Decl. ¶ 13.  With that release, the defendant notified the plaintiff that other responsive records had also been located and were under review "to determine what information could be released and the [the defendant] would finish [its] review as expeditiously as possible." *Id.*

By letter dated October 26, 2009, the defendant informed the plaintiff that it had no records responsive to the second part of the plaintiff's request.  Janosek Decl. Tab F at 1, ECF No. 12-8.  Of the three documents responsive to the first and third parts of the plaintiff's request, two were being withheld in their entirety under FOIA Exemption 5, 5 U.S.C. § 552(b)(5), which exempts from disclosure "inter-agency or intra-agency memoranda or letters which would not be available by law to a party in litigation with the agency."  Janosek Decl. Tab F at 1.  Portions of the same documents were also being withheld under FOIA Exemption 1, 5 U.S.C. § 552(b)(1), which exempts from disclosure items properly classified.  *Id.* at 1–2.  The third document was not released as it "did not originate with this Agency" and had "been referred to the National Security Council for review and direct response to [the plaintiff]."  *Id.* at 2.

---

[3] The request also sought expedited processing and a request for a fee waiver.  Janosek Decl. Tab A at 5–6.  The fee waiver was granted but expedited processing was initially denied.  Janosek Decl. ¶ 11.  After an administrative appeal, the request for expedited processing was granted.  *Id.* ¶ 12.

[4] The defendant does not specify to whom the documents had been previously released.  *See* Janosek Decl. ¶ 13; Janosek Decl. Tab E at 2, ECF No. 12-7.

The plaintiff timely filed an administrative appeal of these determinations.  Janosek Decl.

¶ 17.  While the appeal was pending, the plaintiff timely filed the instant action.  *Id.*  The

defendant subsequently released redacted copies of IAD Management Directive 20 and

NSA/CSS 1-58, which were the two documents it referred to in the October 26, 2009 letter as

being withheld in their entirety under Exemption 5.  *Id.* ¶ 15 n.2.  Portions of those documents

continued to be withheld under Exemptions 1 and 3.  *Id.*  Thus, at issue in this case are the

portions of IAD Management Directive 20 and NSA/CSS 1-58 withheld under Exemptions 1 and

3, and NSPD 54.  *Id.*  NSPD 54 is the document that did not originate with the defendant agency,

and is being withheld in its entirety under the presidential communications privilege portion of

Exemption 5, 5 U.S.C. § 552(b)(5), with one paragraph also being withheld under Exemptions 1

and 3.  *See* Janosek Decl. ¶ 34.

## B.     Procedural History

The plaintiff filed the instant action against the Defendant and the National Security

Council ("NSC") asserting four claims for relief regarding the defendant's alleged failure to

comply with the FOIA's statutory deadlines and to disclose responsive agency records (Counts

One and Two); the National Security Council's alleged failure to disclose responsive agency

records (Count 3); and the defendant's alleged violation of the Administrative Procedure Act, 5

U.S.C. § 706 (Count 4).  *See* Compl. ¶¶ 52–73.  The Complaint seeks production of all

responsive records, a *Vaughn* index describing all records withheld and the exemptions under

which they are being withheld, and attorneys' fees.  *Id.* at 10–11.

The defendant and the NSC filed a partial motion to dismiss pursuant to Federal Rule of

Civil Procedure 12(b)(6) for failure to state a claim as to Counts Three and Four and to dismiss

all claims against the NSC.  *See* Def.'s Partial Mot. to Dismiss at 1, ECF No. 4.  This motion was

granted because the NSC is not an "agency" within the meaning of the FOIA, *see* Mem. Op. at

8–9, ECF No. 9, and adequate relief is available to the plaintiff under the FOIA without resort to the APA.  *See id.* at 14.

Now pending before the Court are the parties' cross motions for summary judgment on the remaining counts, Counts One and Two.  After the motions were fully briefed, the D.C. Circuit released its opinion in *Judicial Watch, Inc. v. United States Secret Service*, 726 F.3d 208 (D.C. Cir. 2013) ("*Judicial Watch*"), which, for the first time, applied the "control" test for whether a record is an "agency record" set forth in *United We Stand America, Inc. v. IRS*, 359 F.3d 595 (D.C. Cir. 2004) ("*United We Stand*"), to the Office of the President.  *See Judicial Watch*, 726 F.3d at 231.  The Court invited the parties to supplement their briefing as to whether NSPD 54 was an "agency record" under the *United We Stand* test.  *See* Minute Order dated September 9, 2013.  The parties declined to do so.  *See* Joint Status Report at 1, ECF No. 26. The motions are now ripe for decision.

## II.    LEGAL STANDARD

Congress enacted the FOIA as a means "to open agency action to the light of public scrutiny." *Am. Civil Liberties Union v. U.S. Dep't of Justice*, 655 F.3d 1, 5 (D.C. Cir. 2011) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)).  The Supreme Court has "consistently recognized [] the basic objective of the Act is disclosure." *Chrysler Corp. v. Brown*, 441 U.S. 281, 290 (1979).  At the same time, the statute represents a "balance [of] the public's interest in governmental transparency against legitimate governmental and private interests that could be harmed by release of certain types of information." *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 559 (D.C. Cir. 2010) (internal citations omitted).  Reflecting that balance, the FOIA contains nine exemptions set forth in 5 U.S.C. § 552(b), which "are explicitly made exclusive and must be narrowly construed." *Milner v. U.S. Dep't of Navy*, 131

5

S. Ct. 1259, 1262 (2011) (internal quotations and citations omitted) (citing *FBI v. Abramson*, 456

U.S. 615, 630 (1982)); *see also Pub. Citizen, Inc. v. Ofc. of Mgmt. and Budget*, 598 F.3d 865,

869 (D.C. Cir. 2010).  "[T]hese limited exemptions do not obscure the basic policy that

disclosure, not secrecy, is the dominant objective of the Act."  *Rose*, 425 U.S. at 361.

The agency invoking an exemption to the FOIA has the burden "to establish that the

requested information is exempt."  *Fed. Open Mkt. Comm. of the Fed. Reserve Sys. v. Merrill*,

443 U.S. 340, 351-352 (1979); *see also Assassination Archives & Research Ctr. v. CIA*, 334 F.3d

55, 57 (D.C. Cir. 2003) (holding that the agency "bears the burden of establishing the

applicability of the claimed exemption.").  In order to carry this burden, an agency must submit

sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, *see*

*Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C. Cir. 1973), or both, to demonstrate that the

government has analyzed carefully any material withheld, to enable the court to fulfill its duty of

ruling on the applicability of the exemption, and to enable the adversary system to operate by

giving the requester as much information as possible, on the basis of which he can present his

case to the trial court.  *Oglesby v. U. S. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996)

("The description and explanation the agency offers should reveal as much detail as possible as

to the nature of the document, without actually disclosing information that deserves

protection…[which] serves the purpose of providing the requestor with a realistic opportunity to

challenge the agency's decision.").

A district court must review the *Vaughn* index and any supporting declarations "to verify

the validity of each claimed exemption."  *Summers v. Dep't of Justice*, 140 F.3d 1077, 1080

(D.C. Cir. 1998).  The FOIA provides federal courts with the power to "enjoin the agency from

withholding records and to order the production of any agency records improperly withheld from

the complainant."  5 U.S.C. 552(a)(4)(B).

Summary judgment is appropriate when "there is no genuine dispute as to any material fact."  FED. R. CIV. P. 56.  "In FOIA cases, '[s]ummary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'"  *Judicial Watch*, 726 F.3d at 215 (D.C. Cir. 2013) (quoting *Consumer Fed'n of Am. v. U.S. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006) and *Gallant v. NLRB*, 26 F.3d 168, 171 (D.C. Cir. 1994)).  "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'"  *Judicial Watch, Inc. v. U.S. Dep't of Defense*, 715 F.3d 937, 941 (D.C. Cir. 2013) (quoting *ACLU v. U.S. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011)); *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir 2007)).

## III.  DISCUSSION

The parties have focused their attention on whether the withholding of records responsive to the plaintiff's request under exemptions to the FOIA was proper, but such exemptions are irrelevant if the records requested are not "agency records" within the meaning of the FOIA.  *See Judicial Watch*, 726 F.3d at 214–15.  If the records in question are not "agency records," courts do not have the power under the FOIA to order their disclosure.[5]  *See id.*; *see also* 5 U.S.C.

---

[5] Whether a document is an "agency record" is a jurisdictional question that must be answered before proceeding to decide a case under the FOIA on the merits.  *See Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 150 (1980) ("Under 5 U.S.C. § 552(a)(4)(B), federal jurisdiction is dependent upon a showing that an agency has (1) 'improperly'; (2) 'withheld'; (3) 'agency records.'  Judicial authority to devise remedies and enjoin agencies can only be invoked, under the jurisdictional grant conferred by § 552."); *Judicial Watch, Inc. v. Fed. Hous. Fin. Agency*, 646 F.3d 924, 926 (D.C. Cir. 2011) ("[U]nder FOIA, a federal court may only order an agency to release "agency records."); *Glick v. Dep't of Army*, 971 F.2d 766, *1 (D.C. Cir. 1992) (per curiam) (affirming dismissal of FOIA suit because "[a]ppellant does not allege that any agency records have been improperly withheld, which is a jurisdictional prerequisite to suit under the FOIA.").  The courts have "an independent obligation to determine whether subject-matter jurisdiction exists."  *Citizens for Responsibility and Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 532 F.3d 860, 862 (D.C. Cir. 2008) (citing *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 706

§ 552(a)(4)(B).  Thus, the Court will first determine if the primary document at issue, NSPD 54,

is an "agency record" before turning to a discussion of the propriety of any exemptions.  Next, it

will review the application of Exemptions 1 and 3 to IAD Management Directive 20 and

NSA/CSS 1-58.  Finally, the Court will turn to the plaintiff's challenge to the defendant's

interpretation of the second portion of the plaintiff's request.

### A.      NSPD 54 Is Not An Agency Record

The defendant withheld NSPD 54 under Exemption 5 and, consequently, the majority of

the parties' briefing centers on whether this exemption's incorporation of the "presidential

communications privilege" applies to NSPD 54.[6]  *See*, Pl.'s Mem. Opp'n to Def.'s Mot. Summ.

J. and in Supp. Pl.'s Cross-Mot. for Summ. J. ("Pl.'s Mem.") at 10–21, ECF No. 14; Def.'s

Mem. at 7–12.  In doing so, the parties gloss over the question of whether NSPD 54 is an

"agency record" at all, which is a threshold question the Court must resolve before turning to the

applicability of any exemptions.  *See* 5 U.S.C. § 552(a)(4)(B) ("On complaint, the district court

of the United States . . . has jurisdiction to enjoin the agency from withholding agency records

and to order the production of any agency records improperly withheld from the complainant.").

Under this Circuit's recent opinion in *Judicial Watch*, the answer to this critical question as to

NSPD 54 is no, rendering all other arguments about the applicability of Exemption 5 moot.

The test for whether a record is an "agency record" for the purposes of the FOIA is

whether an agency (1) "either create[s] or obtain[s]" the record and (2) is "in control of the

requested materials at the time the FOIA request is made."  *U.S. Dep't of Justice v. Tax Analysts*,

---

(D.C. Cir. 2008)).  Thus, even though the parties have not raised this issue, the Court is obligated to determine, *sua sponte*, whether the records in dispute are "agency records."

[6] Exemption 5 incorporates standard discovery privileges which would normally exempt documents from production in the course of civil litigation.  *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 148–49 (1975).  The "presidential communications privilege" is one of those discovery privileges incorporated into Exemption 5.  *See Judicial Watch*, 726 F.3d at 229 n.25 (quoting *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 321 (D.C. Cir. 2006)); *Citizens for Responsibility and Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 532 F.3d 860, 865 (D.C. Cir. 2008).

492 U.S. 136, 144–45 (1989).  The defendant has admitted that it "obtained" NSPD 54.  *See* Janosek Decl. ¶ 31 ("[NSPD 54] was issued to a number of high ranking Presidential advisers, Cabinet officials, and agency heads including (*inter alia*) the Director of the NSA."); Def.'s Mem. in Opp'n to Pl.'s Cross-Mot. Summ. J. and Reply in Supp. of Def.'s Mot. Summ. J. ("Def.'s Reply") at 17, ECF No. 16 ("NSA has possession of a copy of NSPD 54").  Thus, the first prong of the *Tax Analysts* test is met.  Yet, "each [prong] must be satisfied for requested materials to qualify as agency records."  *Tax Analysts*, 492 U.S. at 144.  The second, "control" prong is ultimately fatal to the plaintiff's request.

*Judicial Watch* established that records originating with the President are subject to the modified "control" test set forth in *United We Stand*, which had previously only been applied to records originating with Congress.  *See* 726 F.3d at 224.  Under this "control" test, a record is under the control of an agency, thus making it an "agency record," if the agency has the "ability to use or dispose of the record as it sees fit."  *United We Stand*, 359 F.3d at 600.  At issue in *Judicial Watch* were the "official visitors logs and/or other records concerning visits to the White House" for a specified period of time.  *Judicial Watch*, 726 F.3d at 214.  The D.C. Circuit found that the logs were in the possession of the United States Secret Service, meaning it "obtained" them, but the Secret Service could "use the records for only two limited purposes" and had to transfer the records to the White House and purge them from its computer systems after sixty days.  *Id.* at 218–19.  The court found that because the White House, an entity not subject to the FOIA, "has manifested its intent to control the entirety of the [visitors logs]," the *United We Stand* test's application militated against a finding that the logs were "agency records" under the FOIA.  *See id.* at 223–24.

As applied to the instant case, the parties do not dispute that NSPD 54 originated with the President or the NSC.  *See* Janosek Decl. ¶ 30 ("This document did not originate with NSA, but rather, it originated with the National Security Council (NSC) and Homeland Security Council (HSC)."); Pl.'s Mem. at 3 ("President George W. Bush issued NSPD 54, but did not release the text of the directive to the public.").  The law in this Circuit is clear that the NSC is not an "agency" for the purposes of the FOIA.  *See Armstrong v. Exec. Office of the President*, 90 F.3d 553, 559 (D.C. Cir. 1996) *cert. denied* 520 U.S. 1239 (1997); *see also Elec. Privacy Info. Ctr. v. NSA*, 795 F. Supp. 2d 85, 91 (D.D.C. 2011).  This is so because the NSC is similar to "the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President," which the Supreme Court has held are not an "agency" for the purposes of the FOIA.  *See Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 155 (1980).  Indeed, in *Kissinger*, the Supreme Court found that papers and notes generated by the future Secretary of State were not "agency records" because they were created while he was functioning as "Assistant to the President."  *Id.* at 156.

The parties also do not dispute that the President placed significant limits on the distribution of NSPD 54.  *See* Janosek Decl. ¶ 31; Pl.'s Mem. at 3; *see also* Ronan Decl. ¶ 7 ("The directive was originally accompanied by a transmittal memo from a Special Assistant to the President . . . [that] emphasized NSPD-54's close-hold nature and the need to safeguard its content, a need that continues to this day.").  For instance, only specific, high-ranking Presidential advisors were given the directive, and they themselves could only distribute the directive to those within their agencies with a "need to know."  Janosek Decl. ¶¶ 32–33.  Indeed, the defendant's declarant notes that "[e]xplicit White House permission is further required before redistributing NSPD-54 to overseas organizations within the Agency or to other Governmental

agencies/organizations," *id.* ¶ 33, and the memorandum accompanying NSPD 54 "makes explicitly clear that a recipient of NSPD 54 *should not* distribute or disclose the document without express permission from the White House." *Id.* ¶ 32 (emphasis in original).

In assessing the level of control exercised by a FOIA-exempt entity, such as Congress or the Office of the President, the D.C. Circuit has considered several indicia.  In *Goland v. CIA*, 607 F.2d 339 (D.C. Cir. 1978), the D.C. Circuit rejected a plaintiff's argument that a classified transcript of a hearing before Congress in the CIA's possession was an "agency record" merely because it was in the CIA's possession.  *See Goland*, 607 F.2d at 343, 345.  The court elaborated that, notwithstanding an agency's possession, courts must look to whether a FOIA-exempt entity retains control of the document.  *See id.* at 345–47.  The court found that because, when the CIA received the document, it "bore the typewritten marking 'Secret' on its interior cover page," and that the CIA "retains a copy of the Transcript for internal reference purposes only, to be used in conjunction with legislation concerning the Agency and its operations," "Congress' intent to retain control of the document is clear."  *Id.* at 347–48.  The court added that "[i]n ascertaining whether a record in the possession of an agency is nonetheless a congressional document, a court will of course accord due weight to the factors that influence us in this case, including (1) Congress' clear intent to exempt congressional documents from disclosure under FOIA; (2) Congress' clear prerogative to prevent disclosure of its own confidential materials; and (3) the danger of inhibiting the legislative and judicial branches from making their records available to the executive branch."  *Id.* at 348 n.48.

Similarly, in *United We Stand*, the D.C. Circuit found that a letter sent to the IRS by the congressional Joint Committee on Taxation was not an "agency record" because the document itself stated: "This document is a Congressional record and is entrusted to the Internal Revenue

Service for your use only.  This document may not be disclosed without the prior approval of the

Joint Committee."  *United We Stand*, 359 F.3d at 600–01.  The court went on to find that the

agency's response to the letter must be released under the FOIA as an agency record, with

portions redacted so as not to disclose the nature of Congress' request.  *Id.* at 602–03.

By contrast, where the FOIA-exempt entity has conveyed documents to an agency

without clear limits on their use or further dissemination, the D.C. Circuit has found the records

to be under agency control.  In *Holy Spirit Association for the Unification of World Christianity*

*v. CIA*, 636 F.2d 838 (D.C. Cir. 1980) ("*Holy Spirit*"), thirty-five documents containing

"correspondence and memoranda originated by one of four congressional committees that

investigated various aspects of Korean-American relations between 1976 and 1978" were

requested under the FOIA from the CIA, which had possession of the documents.  636 F.2d at

840, *vacated in part on other grounds by* 455 U.S. 997 (1982).  The court contrasted the

treatment of the requested records with the treatment of three "sealed cartons of additional

congressional documents" transferred to the CIA "for safekeeping" at around the same time that

were "accompanied by a memorandum from the House Committee on International Relations

indicating that the Committee retained jurisdiction over the documents, that the documents

contained classified information, and that access to the files was limited to those with

authorization from the Clerk of the House."  *Id.* at 842.  Unlike the three sealed cartons of

documents, the thirty-five records at issue in *Holy Spirit* were not accompanied by any

instructions and the agency's declarant made "clear that only some congressional documents

transferred to the CIA contain classified information or details of intelligence activities."  *Id.* at

841–42.  The court found that the thirty-five records released to the CIA by Congress without

"some clear assertion of congressional control . . . either in the circumstances of the documents'

creation or in the conditions under which they were sent to the CIA" were "agency records" for the purposes of the FOIA.  *Id.* at 842.

Likewise, in *Paisley v. CIA*, 712 F.2d 686 (D.C. Cir. 1983), the D.C. Circuit found that documents transferred from the Senate Select Committee on Intelligence to the FBI and CIA pertaining to the shooting death of a former employee were "agency records" because the Committee "affixed no external indicia of control of confidentiality on the faces of the documents," nor were the "transcripts of testimony [contained in the documents] conducted under any special conditions of secrecy." *Paisley*, 712 F.2d at 694.  Additionally, the court found that even letters from the Committee to the agencies at issue indicating "the Committee's desire to prevent [the documents'] release without its approval" were insufficient to indicate that Congress retained control because they were "too general and sweeping to provide sufficient proof, when standing alone, of a specific intent to transfer these five . . . documents to the FBI and the CIA for a 'limited purpose and on condition of secrecy.'" *Id.* at 695 (quoting *Goland*, 607 F.2d at 348 n.48).

Thus, for the purposes of determining the indicia of control evidenced by the FOIA-exempt entity, the D.C. Circuit has consistently looked to the intent of the entity manifested at the time of transfer and the clarity of that intent with respect to the documents subject to the FOIA request.

The D.C. Circuit in *Judicial Watch*, in applying the *United We Stand* control test to the Office of the President, found that "the indicia of White House control in [*Judicial Watch*] are even stronger than the indicia of congressional control in *United We Stand*." *Judicial Watch*, 726 F.3d at 223.  By contrast to the indicia in *United We Stand*, where Congress had asserted only a "limited scope of confidentiality and hence asserted control over only a limited subset of

13

documents," the White House in *Judicial Watch* had "manifested its intent to control the entirety

of the [visitors logs at issue], all of which it expects the Secret Service to transfer to it." *Id.*  That

control was manifested by, *inter alia*, the signing of a Memorandum of Understanding between

the White House and the Secret Service instructing that the logs were to be used "for two limited

purposes,"[7] and were to be transferred to the White House and erased from the Secret Service's

computer servers every sixty days.  *See id.* at 212.  The Memorandum of Understanding also

expressly provided that "[a]ny information provided to the Secret Service for the creation of [the

logs] is provided under an express reservation of White House control."  *Id.* at 223 (internal

quotation marks omitted).

　　In the instant case, *Judicial Watch* applies *a fortiori*.  The White House has manifested its

intent to control the entirety of NSPD 54 and its dissemination even within agencies to which the

document was distributed, *see* Janosek Decl. ¶ 33, a level of control not present in *Judicial*

*Watch*.  Similar to the records in *United We Stand* and *Goland*, NSPD 54 was distributed to

agencies with an accompanying memorandum that "forbids . . . intra-agency distribution except

on a need to know basis," and directs that "all public requests for disclosure of NSPD-54" be

referred to the NSC and Homeland Security Council ("HSC").  Janosek Decl. ¶¶ 32–33.  Indeed,

the memorandum made clear that "a recipient of NSPD 54 *should not* distribute or disclose the

document without the express permission of the White House."  *Id.* ¶ 32 (emphasis in original).

NSPD 54 is decidedly unlike the agency-controlled documents in *Paisley* and *Holy Spirit*, where

the FOIA-exempt entity, Congress, placed little or no restrictions on the documents once they

were transferred to the agencies.  Thus, under the *United We Stand* test, the defendant has shown

a sufficiently "clear . . . expression of [White House] intent to control" NSPD 54, making it a

---

[7] The Secret Service was only to use the logs to "perform a background check on the visitor, and to verify the
visitor's admissibility at the time of the visit."  *Judicial Watch*, 726 F.3d at 212.

non-agency record for the purposes of the FOIA.[8]  *See* 5 U.S.C. 552(a)(4)(B).  Consequently, as

it pertains to NSPD 54, summary judgment is granted to the defendant and denied to the plaintiff.

### B.      Application Of Exemption 5 To NSPDs And Their Predecessors

Although the Court finds that NSPD 54 is not an agency record under the changed legal

landscape created by *Judicial Watch*, the determination not to release a NSPD is consistent with

the few FOIA cases to have previously addressed this issue.  It is first necessary to briefly

describe the history of these national security records before discussing the way they have been

addressed in prior court decisions.

### 1.      *National Security Instruments*

NSPD 54 is an example of a type of national security document that began with the

formation of the NSC in 1947.  *See* HAROLD C. RELYEA, CONG. RESEARCH SERV., CRS NO. 98-

611, PRESIDENTIAL DIRECTIVES: BACKGROUND AND OVERVIEW at CRS-8 (2007) ("PRESIDENTIAL

DIRECTIVES").  What started as "policy papers" prepared by the NSC's members and staff

eventually became documents signed by the President mandating operating policy.  *Id.* at CRS-

---

[8] The impact of *Judicial Watch* remains unclear regarding the extent to which the President may make policy decisions and issue directives to Executive branch agencies outside the public eye and beyond the reach of the FOIA, which "is broadly conceived . . . to permit access to official information long shielded unnecessarily from public view . . . [with] a judicially enforceable public right to secure such information from possibly unwilling official hands."  *See Rose*, 425 U.S. at 361.  The plaintiff argues convincingly for narrowly construing the scope of Exemption 5 and the presidential communications privilege because "the public will be directly affected by the exercise of the government's authority" embodied in NSPD 54.  Pl.'s Mem. at 21; *id.* at 13–14; *see also Judicial Watch, Inc. v. U.S. Dep't of Justice*, 365 F.3d 1108, 1116 (D.C. Cir. 2004) (noting the D.C. Circuit has "caution[ed] against the dangers of expanding to a large swath of the executive branch a privilege that is bottomed on a recognition of the unique role of the President") (quoting *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997) (internal quotation marks omitted)).  As the instant case demonstrates, however, under *Judicial Watch,* a President need not invoke the presidential communications privilege—or any other enumerated exemption—to avoid disclosure pursuant to the FOIA of records for which he or she has clearly exerted efforts to retain control and limit dissemination "in the course of" "the carrying out of the constitutional, statutory, official [and] ceremonial duties of the President."  *Judicial Watch*, 726 F.3d at 228 (quoting the definition of "Presidential records" in the Presidential Records Act, 44 U.S.C. § 2201(2)).  This result is difficult to reconcile with the D.C. Circuit's rejection in *Citizens for Responsibility and Ethics in Washington v. United States Department of Homeland Security*, 532 F.3d 860 (D.C. Cir. 2008), of the idea that "the President should *never* have to assert executive privilege in the Exemption 5 context because doing so is simply too burdensome" noting that "can't be right."  532 F.3d at 867 (emphasis in original).  Nevertheless, *Judicial Watch* appears to create an alternative mechanism for the President to keep records secret without resorting to a FOIA exemption.

8–9.  "In general, they were not required to be published in the *Federal Register*, were usually security classified at the highest level of protection, and were available to the public after a great many years had elapsed, usually at the official library of the President who had approved them." *Id.* at CRS-9.

These national security documents have been known by a series of titles as different Presidents have called them by different names, including NSC Policy Papers, National Security Action Memoranda, National Security Study Memoranda, Presidential Review Memoranda, and Presidential Decision Directives.  *Id.* at CRS-9–11.  President George W. Bush referred to them as National Security Presidential Directives.  *Id.* at CRS-12.  The secretive nature of these documents is made apparent by the fact that the public only learns of them once they are released and can only guess at how many each President has issued.  *See id.* at CRS-11 ("While the number of NSDs issued by President [George H.W.] Bush remains officially secret, an October 21, 1991, directive concerning single scope security background investigations was designated NSD-63.").  All of them are generated and controlled by the President and NSC staff.  *Id.* at CRS-9–12.[9]

### 2.      *National Security Instruments In The Courts*

This is not to say, however, that no NSC directives have ever been released to the public. For instance, in *Los Angeles Times Communications LLC v. United States Department of the Army*, 442 F. Supp. 2d 880 (C.D. Cal. 2006), the Department of the Army included a copy of a

---

[9] The plaintiff makes an appealing, but ultimately unavailing, argument that allowing the withholding of NSPD 54 under an expansive view of the presidential communications privilege would allow "documents that will have significant and wide-spread impact [to][] be kept totally hidden" and "bring about the very dangers" of "allow[ing] for the creation of 'secret law,' the very thing that the FOIA seeks to prevent." Pl.'s Mem. at 15; *see also* Pl.'s Reply at 10 ("By labeling NSPD 54 a simple 'communication,' the NSA mischaracterizes the significance of the document and would encourage expansion of secret law.").  Indeed, the D.C. Circuit has cautioned that Congress "indicated unequivocally that the purpose of [FOIA] was to forbid secret *law*.  And substantive declarations of policy are clearly 'law' within the meaning of that prohibition."  *Sterling Drug, Inc. v. FTC*, 450 F.2d 698, 713 (D.C. Cir. 1971) (Bazelon, C.J., concurring in part and dissenting in part) (emphasis in the original).  That being said, *Judicial Watch* binds this Court.

NSPD dated May 11, 2004 "regarding United States government operations in Iraq" as part of a declaration in a FOIA case seeking other information about government contractors operating in Iraq.  442 F. Supp. 2d at 891 n.18.  Similarly, in *Schreibman v. United States Department of Commerce*, 785 F. Supp. 164 (D.D.C. 1991), the National Institutes of Standards and Technology ("NIST") provided a copy of a "Presidential directive establishing data security policy and standards" voluntarily in response to a FOIA request.  785 F. Supp. at 165.

By contrast to these examples of voluntary disclosure of Presidential directives, in two cases where FOIA requests directly sought such instruments, the requests were rejected.  In *Center for National Security Studies v. Immigration and Naturalization Service*, No. 87-2068, 1990 WL 236133 (D.D.C. Dec. 19, 1990), the plaintiff sought documents under the FOIA pertaining to the "Alien Border Control Committee," which was a "multi-agency task force formed to address the identification and removal of suspected alien terrorists" under the Reagan Justice Department.  1990 WL 236133 at *1 (internal quotation marks omitted).  Among the responsive documents the Department of Justice located was National Security Decision Directive[10] 207, which the defendant withheld in its entirety under FOIA Exemption 1 for classified documents.  *Id.* at *2; *see* 5 U.S.C. § 552(b)(1).  Since the plaintiff produced no evidence of bad faith on the part of the defendant in its "predictions of harm" to national security if the Directive were released and because such predictions were "entirely plausible and sufficiently descriptive to substantiate an exemption 1 claim," the court in *Center for National Security Studies* granted summary judgment to the defendant and did not order release of the Directive.  *Id.* at *3.

In *Halperin v. National Security Council*, 452 F. Supp. 47 (D.D.C. 1978), the plaintiff sought disclosure of a "compilation of the number and exact title of each National Security Study

---

[10] This is the name given to NSC policy papers by President Reagan.  *See* PRESIDENTIAL DIRECTIVES at CRS-11.

Memoranda" and "National Security Divisional Memoranda" issued during a specific period of time under the Nixon Administration. *Halperin*, 452 F. Supp. at 48. These lists of national security instruments generated by the Nixon NSC and some of the individual titles on the list were classified as "Secret." *Id.* at 48–49. The defendant withheld the lists in their entirety under Exemption 1 and Exemption 5 to the FOIA. *Id.* at 49. The court in *Halperin* found that the lists were properly classified and non-segregable under Exemption 1 and granted summary judgment to the defendant. *Id.* at 52. Since the court decided the issue based solely on Exemption 1, it expressly declined to address the applicability of Exemption 5. *Id.* at 49.

These cases indicate that NSPD 54 is the type of document that is generally not ordered disclosed under the FOIA. Such national security instruments appear to have only been released voluntarily by the President or NSC that created them, or their release has been approved after a substantial period of time has passed, typically through Presidential libraries. *See* PRESIDENTIAL DIRECTIVES at CRS-9. Although the plaintiff in the instant case has made strong arguments as to why the public has an interest in the release of NSPD 54, precedent counsels that such documents have not been found releasable under the FOIA.[11] In this respect, NSPD 54 is similar in kind to the records at issue in *Judicial Watch*, where the circumstance deemed "most important" in bolstering the conclusion that those White House records were beyond the reach of FOIA, was that the court was "not confronted with an attempt to protect information that would otherwise be subject to FOIA." 726 F.3d at 232.

*       *       *

In *Judicial Watch,* the D.C. Circuit responded to the "fear that this case will open the floodgates to White House efforts to circumvent FOIA," by clarifying that its holding was not

---

[11] Since NSPD 54 is not an "agency record" for the purposes of the FOIA, the Court does not opine as to whether the presidential communications privilege encompassed in Exemption 5 is coextensive with the privilege as it is asserted in the civil discovery context, as the parties have disputed in their briefing.

that "*any* record touching on White House communications were necessarily exempt from

FOIA."  726 F. 3d at 231 (emphasis in original).  The court pointed to three circumstances that

limited the application of its holding: first, that "no deference" was given to a Memorandum of

Understanding ("MOU") between the White House and the agency stating that the White House

retained "exclusive *legal* custody and control" of the records at issue.  *Id*. (emphasis in original).

While not acceding to the legal conclusion articulated in the MOU, the court did, however, rely

on "the way in which both parties have historically regarded and treated the documents."  *Id*.

Similarly, in the instant case, the White House's explicit instructions regarding the limited use

and dissemination of NSPD 54 only with the White House's approval, appears to satisfy this

circumstance showing that the White House took clearly articulated steps to retain control over

the document.

    The second circumstance cited by the court in *Judicial Watch* as limiting its holding is

that potential release of the records at issue under the FOIA would "put the President on the

horns of a dilemma between surrendering his confidentiality and jeopardizing his safety," which

the court found to be "comparable to" the "presence of [] unacceptable choice," faced by

Congress in *United We Stand* and *Goland*.  *Id*. at 231–32.  In *Goland*, the D.C. Circuit noted the

conflict between Congress' "constitutional prerogative of maintaining secrecy" in its

communications with agencies over which it "exercises oversight authority" and a finding that

any records in possession of an agency are automatically subject to the FOIA, which the D.C.

Circuit noted would cause "an impairment of [Congress'] oversight role."  *Goland*, 607 F.2d at

346.  In *United We Stand*, where the documents at issue were created by an agency in response to

a Congressional request, Congress evinced a clear intent to keep its request to the agency secret

as part of "the Joint Committee['s] belie[f] that confidentiality is critical to its work."  *United We*

*Stand*, 359 F.3d at 602.  In the instant case, the defendant notes that NSPD 54 requested that "his

advisers . . . submit follow-up reports," Def.'s Mem. at 10, and confidentiality was necessary

because the release of NSPD 54 "would 'limit the President's ability to communicate his

decisions privately, thereby interfering with his ability to exercise control over the executive

branch.'"  *Id.* (quoting *In re Sealed Case*, 121 F.3d at 745–46).  This protection of confidentiality

and the President's role in overseeing executive agencies is the same type of conflict the D.C.

Circuit was concerned with in *Goland*, *United We Stand*, and *Judicial Watch*.

Finally, the last circumstance, deemed to be the "most important," limitation on the

*Judicial Watch* holding is that the requested records "involves a category of documents that

effectively reproduces a set of records that Congress expressly excluded from FOIA's coverage,"

*id.* at 232, as detailed in the legislative history for the 1974 FOIA amendments, *id.* at 224–25

(discussing the Conference Report, which stated that the definition of an "agency" subject to

FOIA does not include the Office of the President or the President's immediate personal staff or

units in the Executive Office whose sole function is to advise and assist the President).  The

White House visitor logs at issue in *Judicial Watch* "would not even arguably be subject to the

Act, but for the President's need for Secret Service protection."  *Id.* at 232.  Thus, the necessity

of sharing with agents of the Secret Service the otherwise FOIA-exempt White House visitor

requests did not pierce the confidentiality that the President was otherwise entitled to enjoy in

those records.  Similarly, here, the necessity of the President of communicating to a limited

group of high-ranking Executive branch officials any instructions and guidance contained in

NSPD 54 in order to effectuate the President "carrying out the constitutional, statutory, or other

official or ceremonial duties of the President," appears to fall squarely within the same category

of documents found to be outside the reach of FOIA in *Judicial Watch*.  Indeed, the question in

*Judicial Watch* appears to be a closer one than the question here, as the documents in *Judicial Watch* were created by an agency subject to the FOIA, namely, the Secret Service, whereas in the instant case NSPD 54 was created by a FOIA-exempt entity itself, namely, the NSC, and merely distributed to agencies subject to the FOIA.

In short, none of the limitations on the holding in *Judicial Watch* appear to distinguish this case or make inapplicable the control test now required in determining whether NSPD 54 is an "agency record."

### C.     The Defendant Properly Asserted Exemption 1 As To The Remaining Documents

The plaintiff challenges the defendant's redaction of IAD Management Directive 20 and NSA/CSS Policy 1-58 under Exemption 1 to the FOIA, which provides that records "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive order" are exempt from mandatory disclosure under the FOIA.  5 U.S.C. § 552(b)(1)(A–B).  The plaintiff argues that "the agency has not established that NSPD 54 and the related records are properly classified."  Pl.'s Mem. at 22.  As discussed in Part III.A, NSPD 54 is a non-agency record and not covered by the FOIA.  Since the remaining two documents did not originate with a FOIA-exempt entity and are "agency records," the defendant bears the burden of showing that they were appropriately redacted.  *See Assassination Archives & Research Ctr.*, 334 F.3d at 57 (D.C. Cir. 2003).

The plaintiff's challenge to the withheld portions consists of a conclusory statement that "[t]he NSA presents no evidence that Ms. Ronan and Ms. Janosek have been delegated classification authority by the President or Vice President, or an agency head that was first delegated such authority by the President or Vice President" as required by Executive Order

21

13526 to confer classification authority.  Pl.'s Mem. at 24.  This challenge fails to address the unequivocal statement by both declarants that they have been delegated classification authority under Executive Order 13526.  *See* Ronan Decl. ¶ 1; Janosek Decl. ¶ 20.  The plaintiff has offered no evidence to cast doubt upon these sworn declarations.

In reviewing withholdings under Exemption 1, "courts must accord *substantial* weight to an agency's affidavit concerning the details of the classified status of the disputed record."  *Wolf*, 473 F.3d at 374 (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)) (emphasis in original, internal quotation marks omitted).  When provided with an affidavit that "describe[s] the justifications for nondisclosure with reasonably specific detail, demonstrate[s] that the information withheld logically falls within the claimed exemption, and [is] not controverted by either contrary evidence in the record nor by evidence of agency bad faith," summary judgment is warranted for the agency.  *Miller*, 730 F.2d at 776 (internal quotation marks and citations omitted).  Here, the plaintiff does not challenge the agency's purported justification for the classification, but rather that the individual declarants did not have adequate classification authority.  *See* Pl.'s Mem. at 23–24.  Considering the substantial deference the Court must show to agency declarations when Exemption 1 is claimed, and in the absence of any evidence other than a bald assertion that the declarants have not proven that they are valid classification authorities, despite their sworn affidavits to the contrary, the Court grants summary judgment to the defendant on its Exemption 1 withholdings in IAD Management Directive 20 and NSA/CSS Policy 1-58.[12]

---

[12] To the extent the plaintiff challenges the defendant's withholdings under Exemption 3, the plaintiff's argument is entirely predicated upon the fact that the "records described . . . are not properly classified."  *See* Pl.'s Mem. at 25. Since the Court has found the plaintiff's argument on that score to be unpersuasive, the plaintiff's Exemption 3 argument is similarly unavailing.

### D.     The Defendant Construed The Plaintiff's FOIA Request Too Narrowly

Finally, the plaintiff argues that the defendant's "interpretation of [the plaintiff's] plainly worded FOIA Request is contrary to the FOIA and relevant case law."  In essence, the plaintiff argues that the defendant improperly narrowed its search when responding to the second part of the plaintiff's requests to search only for records distributed "to the NSA" rather than "to any federal agency charged with implementing the cybersecurity scheme," as stated in the plaintiff's request.  Pl.'s Reply Supp. Pl.'s Cross-Mot. Summ. J. ("Pl.'s Reply") at 12, ECF No. 17; *see also* Janosek Decl. Tab A at 5.  The defendant's declarant gives credence to the plaintiff's argument, as the Janosek Declaration notes the defendant "searched for responsive records by giving plain meaning to Plaintiff's request and thus searched for 'Executing protocols' that were 'distributed to' to [sic] the NSA – meaning, protocols that emanated from outside the NSA and were 'distributed to' NSA."  Janosek Decl. ¶ 36.

The plaintiff's request sought "the full text, including previously unreported sections, of the Comprehensive National Cybersecurity Initiative, as well as any executing protocols distributed to *the agencies in charge of its implementation.*"  Janosek Decl. Tab A at 5 (emphasis added).  There is no dispute that the defendant is one of the agencies "in charge of" the CNCI's implementation, and, consequently, the agency's search for pertinent records "distributed to the NSA" fell within the request's parameters.  Yet, the plaintiff is correct that the defendant "may be in possession of the CNCI or related records that were issued to the FBI, the CIA, or other federal agencies," either by an entity other than the defendant or by the defendant itself.  *See* Pl.'s Reply at 12.  Such documents, under the plain meaning of the plaintiff's FOIA request, are responsive to the request.[13]

---

[13] The plaintiff also asserts that NSPD 54 is responsive to the second part of the plaintiff's FOIA request and therefore should have been deemed a responsive record to this portion of the request.  *See* Pl.'s Mem. at 26.  The

The plaintiff is correct that "an agency . . . has a duty to construe a FOIA request liberally." *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995).  By limiting its interpretation of records responsive to the plaintiff's requests only to records emanating from outside the defendant agency, the defendant violates this basic FOIA convention.  If the defendant itself generated an executing protocol for the CNCI and distributed it to other relevant federal agencies, those records were "distributed to the agencies in charge of [the CNCI's] implementation."

Notably, the plaintiff is not asserting that the defendant performed an inadequate search for responsive records.  *See* Pl.'s Mem. at 27 ("[The plaintiff] has not challenged, and does not purport to challenge here, the sufficiency of the [defendant's] search for agency records.").  Instead, the plaintiff is arguing that the defendant "searched for, located, reviewed, but unlawfully withheld as 'unresponsive' records that are responsive to Category 2 of [the plaintiff's] FOIA Request."  *Id.*  Thus, the defendant is directed to produce to the plaintiff records discovered responsive to the second part of the plaintiff's request, including executing protocols in the defendant's possession that were distributed to other relevant federal agencies, that were received by the NSA or distributed by the NSA, unless those records are properly withheld, in whole or in part, under exemptions to the FOIA.

## IV.    CONCLUSION

The primary document at issue here, NSPD 54, is not an agency record for the purposes of the FOIA under the *Judicial Watch* standard and therefore need not be disclosed in response to a FOIA request.  In addition, the plaintiff's challenges to the defendant's redactions of IAD

---

defendant admits as much, Def.'s Reply at 17, but, as discussed *supra*, this document is properly withheld because it is not an "agency record" for the purposes of the FOIA.  Thus, the plaintiff's argument that NSPD 54 is responsive to the second portion of its request if it were an "agency record" is technically correct, but does not yield a different result.

Management Directive 20 and NSA/CSS 1-58 under Exemptions 1 and 3 are rejected.  The plaintiff is correct, however, that the defendant improperly narrowed its search for responsive records to the second portion of the plaintiff's FOIA requests to only those records distributed to the NSA, rather than to all agencies charged with implementing the CNCI.  Consequently, the defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part and the plaintiff's Cross-Motion for Summary Judgment is GRANTED in part and DENIED in part. The defendant shall review its search to determine if any records found in that search are responsive to the plaintiff's FOIA request, conforming its interpretation of that request to the instructions of this Court.  After such review, the defendant shall supplement its production to the plaintiff with any responsive records or, in the alternative, submit a *Vaughn* index detailing what records or portions of records are being withheld and under what exemptions to the FOIA. The parties are instructed to jointly file a briefing schedule to facilitate the timely production of these documents and resolution of any disputes which may arise regarding their production.

An appropriate Order will accompany this Memorandum Opinion.

Date:  October 21, 2013

_____
BERYL A. HOWELL
United States District Judge